The **FORT WORTH NATIONAL COR-PORATION**, Plaintiff-Appellee,

v.

**FEDERAL SAVINGS AND LOAN IN-SURANCE CORPORATION**, Federal Home Loan Bank Board, et al., Defend-ants-Appellants.

The **FORT WORTH NATIONAL CORPORATION**, Petitioner,

v.

**FEDERAL HOME LOAN BANK BOARD** and Federal Savings and Loan Insur-ance Corporation, Respondents.

Nos. 71–2821, 71–2828.

United States Court of Appeals, Fifth Circuit.

Oct. 12, 1972.

**50**

Arthur W. Leibold, Jr., Gen. Counsel, Paul E. McGraw, Associate Gen. Counsel, Daniel J. Goldberg, Asst. Gen. Counsel, Washington, D. C., Phelps, Dunbar, Marks, Claverie & Sims, Philip deV. Claverie, New Orleans, La., for defendants-appellants.

Donald I. Baker, Stewart R. Smith, Attys., Dept. of Justice, Washington, D. C., amicus curiae.

Thomas H. Law, Boe W. Martin, Fort Worth, Tex., Eugene J. Metzger, Washington, D. C., for plaintiff-appellee.

Before WISDOM, GOLDBERG, and CLARK, Circuit Judges.

WISDOM, Circuit Judge:

The two cases consolidated for purposes of appendix, briefs, and argument present important questions concerning (1) the appropriate review procedure under section 408 of the National Housing Act, as amended by the Savings and Loan Holding Company Amendments of 1967, 12 U.S.C. § 1730a et seq., and (2) the authority of the Federal Savings and Loan Insurance Corporation to disapprove applications for acquisitions of institutions insured by the Corporation on the ground that such acquisitions may substantially lessen competition. The first case, No. 71–2821, is an appeal by the Federal Home Loan Bank Board (Board), the Federal Savings and Loan Insurance Corporation (the Corporation), and the individual members of the Board from a preliminary injunction issued by the district court in an action commenced by Fort Worth National Corporation (FWN). The second case, No. 71–2828, is a petition by Fort Worth National Corporation to review an order of the Corporation disapproving FWN's application to acquire control of Mutual Savings and Loan Association, Fort Worth, Texas. Jurisdiction in the first case is based on 28 U.S.C. § 1292, and in the second on 12 U.S.C. § 1730a(k).

We reverse the decision of the district court in No. 71–2821 and affirm the order of the Corporation in No. 71–2828.

I.

The Federal Savings and Loan Insurance Corporation is a corporate agency of the United States having responsibility for insuring the savings accounts of all federal savings and loan associations and other eligible institutions. 12 U.S.C. § 1725; 12 U.S.C. § 1730(k)(1). The Corporation is also responsible for administering the Savings and Loan Holding Company Amendments of 1967. 12 U.S.C. § 1730(a)–(l). The Federal Home Loan Bank Board is an independent agency of the United States which, along with other functions, is responsible for the direction of the Corporation.

Fort Worth National Corporation is a one-bank holding company. Its principal subsidiary is Fort Worth National Bank, the largest commercial bank in Fort Worth, Texas. The corporation also owns eight other financially related subsidiaries, including a mortgage banking company. On December 22, 1970, FWN entered into an agreement with Lacy Bogess, acting individually and on behalf of the other shareholders of Mutual Savings and Loan Association, for the purchase of one hundred percent of Mutual's issued and outstanding Permanent Reserve Fund Stock. Mutual is a savings and loan association insured under the National Housing Act and is the third largest savings and loan association in Fort Worth. The contract provided that Bogess would sell all the Mutual shares owned by him and use his best efforts to induce all other shareholders to sell their shares to FWN. The contract also stated that it was to continue in force until September 30, 1971, at which time the seller had the option to terminate the offer. All the shareholders subsequently agreed to sell their shares and delivered one hundred percent of Mutual's stock to an escrow agent under the contract.

On February 24, 1971 FWN submitted its application to the Corporation, in accordance with section 408(e) of the National Housing Act, as amended, 12 U.S.

C. § 1730a(e), requesting approval of the proposed acquisition of Mutual. Under the Act, all acquisitions of insured savings and loan institutions must be approved by the Corporation. After receiving the application, the Federal Home Loan Bank Board, because of its responsibility for direction of the Corporation, sent two letters to FWN outlining deficiencies in the application and requesting additional information. FWN complied by filing two amendments to its application, the first on April 14 and the second on April 25.

In response to its request, the Board received a letter dated June 22 from the Assistant Attorney General, Antitrust Division, Department of Justice, which set forth an analysis of the anticompetitive effects of FWN's purchase of Mutual and stated that the proposed acquisition would "eliminate substantial direct competition between [FWN] Corporation's subsidiaries and Mutual Savings and . . . have a significantly adverse effect on competition in . . . Fort Worth. . . ."

After receiving the Department's opinion letter, the Board's staff completed processing of FWN's application and submitted the staff reports and the application to the Board on August 13, in time for the matter to be placed on the agenda for the August 17 meeting. At the same time, FWN was advised by letter that its application would be considered at the next meeting of the Board. The Board then met on August 17 and voted unanimously (Resolution 17836) to disapprove FWN's application because of its anticompetitive effect. The Board directed its Secretary to send a letter, stating the reasons for the disapproval of the application, to the President of the Federal Home Loan Bank Board of Little Rock for transmittal to FWN. The Board's decision was not then made public or communicated to FWN, however, since it was decided that release of the resolution should await completion of the opinion letter, which would take several days to draft.

FWN's contract with Mutual was to expire on September 30. Unaware of the Board's decision, FWN decided to file a complaint for injunctive and declaratory relief against the Board, the Corporation, and the individual members of the Board. Early on the morning of August 25, FWN's counsel delivered copies of the complaint and a supporting memorandum to the office of the Secretary of the Board. The complaint had not been filed with the Clerk of the district court at this time, however. Later the same morning, counsel for the Board telephoned FWN's counsel to inform him that the Board had disapproved FWN's application on August 17. On the afternoon of August 25, the Board met and authorized issuance of an opinion letter stating the reasons for its disapproval of FWN's application. About an hour after the Board's meeting, FWN filed the complaint in the present action.

On August 27, the Board mailed copies of its resolution and the opinion letter to FWN's counsel. On September 3, 1971, FWN received a copy of the letter, forwarded by the Federal Home Loan Bank Board of Little Rock.

The district court held a hearing on September 13, and on September 14 issued a preliminary injunction restraining the Board, the Corporation, and the Board members from "interfering with [FWN] or pursuing sanctions against [FWN] . . . in acquiring the stock of Mutual and retaining it . . . during the life of this temporary injunction." The district court's order permitted FWN to acquire "legal and equitable title to the stock of Mutual," but required the stock to be held in escrow pending further proceedings. In its opinion, the district court concluded that the Court of Appeals have exclusive jurisdiction to review orders of the Corporation and therefore expressly declined to pass on the merits of the parties' contentions. Nevertheless, the Court stated that it was granting the injunction "solely for the purpose of maintaining the status quo and preventing

irreparable injury" because there was "not sufficient time to get action on an appeal from the Board's order before the Court of Appeals before the expiration date of [FWN's] contract."

The district court denied the Board's motion for a stay pending appeal, and on September 15 FWN acquired the stock of Mutual. The parties appealed both the district court's order and the order of the Corporation to this Court.

## II.

### No. 71–2821

The first issue on appeal concerns the jurisdiction of the district court to issue a preliminary injunction. Section 408(k) of the Savings and Loan Holding Company Amendments of 1967, 12 U.S. C. § 1730a(k), provides, in pertinent part, that

[A]ny party aggrieved by an order of the Corporation under this section may obtain a review of such order by filing in the court of appeals of the United States for the circuit in which the principal office of such party is located, or in the United States Court of Appeals for the District of Columbia Circuit, within thirty days after the date of service of such order, a written petition praying that the order of the Corporation be modified, terminated, or set aside. . . . Upon the filing of such petition, such court shall have jurisdiction, which upon the filing of the record shall be exclusive, to affirm, modify, terminate, or set aside, in whole or in part, the order of the Corporation.

■ The appellant contends that under section 1730a(k) the exclusive method for review of the Corporation's order disapproving FWN's application was by petition for review in the Courts of Appeals and that the district court therefore had no jurisdiction to issue a preliminary injunction. We agree.

■■ When Congress has prescribed a particular method of review, that procedure is exclusive. Whitney National

Bank in Jefferson Parish v. Bank of New Orleans, 1965, 379 U.S. 411, 85 S. Ct. 551, 13 L.Ed.2d 386; Macauley v. Waterman Steamship Corp., 1946, 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839; Myers v. Bethlehem Shipbuilding Corp., 1938, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638. By specifying that appeals under section 1730a(k) were to be filed in the Courts of Appeals, Congress expected to prevent conflicting rulings and duplicative proceedings that inevitably would result from permitting collateral attack of Corporation orders in the various district courts. Providing an exclusive method of review facilitates efficient and timely resolution of disputes concerning agency actions and promotes uniformity in judicial decisions. Furthermore, it is clear that FWN could have appealed in the manner provided by the Act. The decision of the Board disapproving FWN's application constituted final agency action, and the resolution of the board became an "order" of the corporation within the meaning of section 1730a(k).

■ On a few occasions courts have been willing to exercise their equity powers to provide additional avenues of review despite the apparent exclusivity of the statutory procedures. Such exceptions, however, have usually been limited to situations in which the statutory review procedure is inadequate. Columbia Broadcasting System v. United States, 1942, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563; R. A. Holman & Co. v. S. E. C., 1962, 112 U.S.App.D.C. 43, 299 F.2d 127, cert. denied, 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404. Or they have been limited to cases in which the agency has exceeded its statutory or constitutional authority. Leedom v. Kyne, 1958, 358 U.S. 184, 79 S.Ct. 180, 3 L. Ed.2d 210. In the proceedings below, the district court relied on the first of these exceptions in holding that it had jurisdiction over the case because there was "not sufficient time to get action on an appeal from the Board's order before the Court of Appeals before the expiration date" of the contract between FWN

and the Mutual shareholders. The district court therefore issued a preliminary injunction to "protect the rights of the plaintiff pending resolution of the question at issue. . . ."

We cannot agree with the district court's view that the statutory review procedures were inadequate. As early as August 25, FWN was aware of the Board's action disapproving its application, and FWN received a copy of the Board's opinion letter on September 3. The termination date of the contract was not until September 30. Thus, FWN had over a month in which to file an appeal in accordance with the statutory procedure. Furthermore, it is beyond question that the Court of Appeals would have been able to issue any type of preliminary relief necessary to protect the rights of the parties pending final resolution of the merits on appeal. Section 1730a(k) states that review of corporation orders shall be governed by 5 U.S.C. § 701 et seq. Section 705 provides that the reviewing court may issue "all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The statutory review procedures incorporated in section 1730a(k) therefore were fully adequate to protect FWN's rights.

FWN's reliance on R. A. Holman & Co. v. S. E. C., *supra,* is equally misplaced. In *R. A. Holman,* the Court of Appeals for the District of Columbia Circuit held that a statute providing for review in specified Courts of Appeals of final orders of the Securities and Exchange Commission did not deprive the district court of jurisdiction over a suit challenging the validity of a Commission rule temporarily suspending the plaintiff from engaging in any distribution of securities under Regulation A. The Commission had previously suspended Regulation A exemption for a particular offering underwritten by the plaintiff, a broker-dealer in securities. The plaintiff filed suit contesting not this suspension order, but rather a separate Commission rule, triggered by the order, preventing the plaintiff from engaging in any distribution under Regulation A. The decision upholding the jurisdiction of the district court was based on the finding that the temporary suspension under the Commission rule was not a final order and thus not immediately appealable under the procedure established under the statute.[1] The Court concluded that suit in the district court was the only method of review which would prevent the plaintiff from suffering irreparable injury. The *Holman* case is clearly inapplicable to situations such as the present one in which the agency has rendered a final order which is immediately reviewable in the Court of Appeals. Unlike the plaintiff in *Holman,* FWN was able to seek relief under the statutory review procedure.

Alternatively, FWN contends that the district court's jurisdiction can be sustained under the doctrine of Leedom v. Kyne, *supra.* FWN's argument is based on its assertion that the Board exceeded its statutory authority by failing to act on FWN's application within ninety days after the application was complete, as provided by 12 U.S.C. § 1730a(e)(1)(B). In *Kyne,* the Supreme Court held that the district court had jurisdiction over a suit challenging a certification order of the National Labor Relations Board, despite the existence of a different statutory review procedure, because the Board's order "[was] made in excess of its delegated powers and contrary to a specific prohibition in the

---

1. The Court of Appeals noted that "[a]ppellant's real attack is not against the suspension 'order,' which if final might have been subject to direct appellate review, but against the consequence resulting from the operation of a separate rule, which followed from the temporary suspension. It therefore seems highly unlikely that Holman would have been permitted to obtain review of the temporary suspension order immediately and directly in this court." 299 F.2d at 130.

Act." 358 U.S. at 188, 79 S.Ct. at 184. As this Court has stated, *Kyne* and its progeny have been limited to extraordinary circumstances "in which there is a 'plain' violation of an unambiguous and mandatory provision of the statute." Boire v. Miami Herald Publishing Company, 1965, 5 Cir., 343 F.2d 17, 21, cert. denied, 382 U.S. 824, 86 S.Ct. 56, 15 L. Ed.2d 70. See Boire v. Greyhound Corp., 1964, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849. No such circumstances are present in this case. Inasmuch as the *Kyne* exception rests on a holding that the agency has exceeded its statutory authority, we find that case inapposite in view of our conclusion in Part III of this opinion that the Corporation's order is supported by the National Housing Act and the Savings and Loan Holding Company Amendments of 1967.

■ Furthermore, we also disagree with the holding of the district court that although the Court of Appeals had exclusive jurisdiction over the merits of the dispute, the district court could nevertheless assume jurisdiction "solely for the purpose of maintaining the status quo and preventing irreparable injury." No such concept of partial jurisdiction has ever been recognized by this Court. Unless it has jurisdiction over the underlying cause of action, a court may not purport to issue preliminary relief in the case. Sires v. State of Washington, 1963, 9 Cir., 314 F.2d 883. Since the district court had no jurisdiction over the subject matter of the case, it was equally without authority to issue a preliminary injunction.

We conclude, therefore, that the defendant's motion to dismiss the action for want of jurisdiction must be granted. In No. 71–2821 the district court's decision is reversed and remanded with orders to vacate the preliminary injunction.

### III.

### No. 71–2828

A. Before considering the merits of the parties' contentions regarding the Corporation's order, we must decide whether this Court has jurisdiction over the Board eo nominee and whether the dispute concerning the validity of the order has been rendered moot.

■ First, the Board asserts that the petition must be dismissed for lack of jurisdiction to the extent that it names the Board as a respondent. The United States, of course, cannot be sued without its consent, and a suit against a federal agency is a suit against the United States. Blackmar v. Guerre, 1952, 342 U.S. 512, 72 S.Ct. 410, 96 L. Ed. 534. Section 1730a(k), governing review under the Savings and Loan Holding Company Amendments, names only the Corporation as a proper party in a petition for review of an order of the Corporation. 12 U.S.C. § 1730a(k). Furthermore, section 1464(d)(1) limits the parties entitled to sue the Board to federal savings and loan associations, and the directors and officers thereof. 12 U.S.C. § 1464(d). See Central Sav. and Loan Ass'n of Chariton, Iowa v. Federal Home Loan Bank Board, 1968, S.D.Iowa, 293 F.Supp. 617, 620–621, aff'd 8 Cir. 1970, 422 F.2d 504; Chase Sav. & Loan Ass'n v. Federal Home Loan Bank Board, 1967, E.D.Pa., 269 F. Supp. 965. We conclude therefore that this Court has no jurisdiction over the Board eo nominee. The appeal may proceed, however, with respect to the other named respondents.

■ Second, the Corporation contends that, assuming it had jurisdiction over the proposed acquisition, any challenge to the validity of the Corporation's order was necessarily mooted by FWN's acquisition of the Mutual stock. Basically, the Corporation's argument is that since section 1730a(e) prohibits any acquisition of an insured institution without prior approval of the Corporation, FWN's consummation of the transaction pursuant to the preliminary injunction violated the Act and rendered moot any challenge to the merits of the order. We disagree.

Certainly, this case is not moot under any traditional meaning of that term, and the Corporation apparently recognizes this fact by its failure to cite any case in support of its position. Furthermore, this is not a case in which an insured institution was acquired before the issuance of an order of the Corporation. Rather, an order had been issued by the Corporation, and under the statute the order became the basis for determining the legality of the acquisition. Since the Corporation's authority to approve acquisitions is governed by the standards incorporated in the statute, the legal effectiveness of the Corporation's order is inseparably linked to compliance with those standards. Consequently, even assuming the Corporation had jurisdiction over the proposed acquisition, we must reach the merits of the Corporation's order before concluding whether the statute has been violated. We now turn to a consideration of FWN's contentions regarding the Corporation's order.

■■■ B. In its petition for review in this case, FWN presents a triple challenge to the order of the Corporation disapproving FWN's application to acquire Mutual. FWN's first and most basic contention is that the statutory prohibition against anticompetitive acquisitions set forth in section 408(e)(2) of the National Housing Act, as amended by the Savings and Loan Holding Company Amendments, 12 U.S.C. § 1730a(e), applies only in situations involving the acquisition of "more than one insured institution" if the acquiring firm is not yet a savings and loan holding company. In order to understand the complexities of FWN's argument, it is necessary to outline briefly the provisions of section 1730a.

Section 1730a is divided into two parts, subsections (e)(1) and (e)(2). As presently relevant, subsection (e)(1) states that it shall be unlawful for any company to acquire control of "one or more insured institutions" without prior written approval of the Corporation. It further provides that the Corporation shall approve an acquisition by a company other than a savings and loan holding company unless it finds that the "financial and managerial resources and future prospects of the [acquiring] company and [acquired] institution" are detrimental to the institution or the insurance risk of the Corporation.

Subsection (e)(2), which sets forth additional standards to be considered in approving such acquisitions, is the focal point of the present dispute. It states, in pertinent part, that

(2) The Corporation shall not approve any acquisition under subparagraphs (A)(i) or (A)(ii), [i. e. acquisitions by a savings and loan holding company] or of more than one insured institution under subparagraph (B), of Paragraph (1) of this subsection [i. e. acquisitions by a company other than a savings and loan holding company] except in accordance with this paragraph. In every case, the Corporation shall take into consideration the financial and managerial resources and future prospects of the company and institution involved, and the convenience and needs of the community to be served, and shall render its decision within ninety days after submission to the Board of the complete record on the application. Before approving any such acquisition, the Corporation shall request from the Attorney General and consider any report rendered within thirty days on the competitive factors involved. The Corporation shall not approve any proposed acquisition—

\* \* \* \* \* \*

(B) the effect of which in any section of the country may be substantially to lessen competition, or tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anti-competitive effects of the proposed acquisition are clearly outweighed in the public interest by the probable effect of the proposed acquisition in meeting the convenience and needs of the community to be served.

FWN contends that, since the first sentence refers to acquisitions of *"more than one* insured institution under subparagraph (B), of paragraph (1) of this subsection", the prohibition in the fourth sentence of the subsection against approval of any acquisition whose effect is "substantially to lessen competition" does not apply to the present transaction in which FWN is acquiring control of *only one* insured institution, Mutual. FWN's suggested construction of subsection (e)(2), however, is not supported by either the words or the policy of the Act.

Although the first sentence refers to multiple acquisitions, the fourth sentence unequivocally states that the Corporation shall not approve *"any* proposed acquisition" having an anticompetitive effect. (Emphasis added.) This broad prohibition cannot be interpreted as limited to situations involving multiple acquisitions without doing violence to the plain meaning of the words of the statute. If Congress desired the Corporation to ignore the anticompetitive effects of unitary acquisitions, it was certainly competent to draft the statute in such a fashion. Instead, it chose words that admit no exceptions. The careful phrasing of subsection (e)(2) is particularly instructive in this respect. The third sentence, for example, employs the phrase "any such acquisition", referring to multiple and other specified acquisitions mentioned in the first sentence, in requiring the Corporation to request the Attorney General for a report on anticompetitive effects. The fourth sentence, however, states that the Corporation is without authority to approve "any proposed acquisition" whose effect is anticompetitive. By deliberately avoiding words of limitation, Congress must necessarily have phrased the prohibition to apply even to acquisitions of one insured institution.

Furthermore, FWN's interpretation would create an incongruous result under the statute. Subsections (e)(1)(A)(ii) and (e)(2), read together, clearly state that the Corporation may disapprove the acquisition of an uninsured institution by a holding company whose subsidiary is an insured institution on the ground that the acquisition is anticompetitive. Under FWN's proposed interpretation of (e)(2), the Corporation would be without authority to disapprove the acquisition of one insured institution by a holding company whose subsidiary is an uninsured institution even though this acquisition may also be anticompetitive. It is difficult, however, to understand why these acquisitions, both having an anticompetitive effect, should be treated differently depending on whether the insured or uninsured institution is in effect the acquiring firm. We cannot impute to Congress such an anomaly.

The legislative history of the Savings and Loan Amendments of 1967, although not without its ambiguities, reinforces the interpretation that we have given to section 1730a(e). Continual references to the Bank Merger Act and the Bank Holding Company Act of 1966 during the legislative hearings indicate that Congress designed the Corporation so that it would apply the same antitrust standard to acquisitions of savings and loans companies as Congress had required federal banking agencies to apply to bank mergers and bank holding company acquisitions. The House Committee Report summarizing the Act states:

> As in the case of the Bank Merger Act and the Bank Holding Company Act, no proposed acquisition could be approved if the Corporation found that it would violate the antimonopoly provisions of section 2 of the Sherman Act, or the anticompetitive provisions of Section 7 of the Clayton Act, unless the Corporation found that the anticompetitive effects of the acquisition clearly outweighed in the public interest by the probable effect of the acquisition in meeting the convenience and needs of the community to be served. H.R.Rep. 997, 90th Cong., 1st Sess. 12 (1967).

It would be contrary to the broad public policy that Congress has enunciated

in similar legislation regulating the acquisition of financial institutions if this Court were to construe the Act as FWN contends. FWN has been unable to point to anything in the legislative history which might even suggest that Congress constructed the statute to exempt unitary acquisitions of insured institutions from the antitrust standard of the Act. Nor can any rationale be suggested for so doing. To the contrary, the increasing concern evinced by Congress over the anticompetitive effects of acquisitions and mergers, coupled with a strong policy favoring considerations of such factors by federal agencies, makes it implausible to suggest that Congress put blinders on the Corporation to prevent it from seeking the realities of an acquisition having anticompetitive effects. Creation of such a peculiar exception could easily subvert the purpose of section 1730a(e). We refuse either to add to or delete from the words of the Act. Reading the phrase "any proposed acquisition" according to its plain meaning, we sustain the Corporation's authority to disapprove acquisitions of one insured institution on the basis of anticompetitive effects.

▪ C. FWN contends that the Corporation lacked jurisdiction over FWN's application because of its failure to render its decision "within ninety days after submission to the Board of the complete record on the application", as provided by section 1730a(e)(2). FWN interprets the phrase "complete record on the application" to mean the point when it filed its last amendment to the application; here, April 25, 1971. Since the Board did not pass on the application until August 17, FWN argues that the ninety day period had been exceeded. The Corporation, on the other hand, maintains that the "complete record on the application" necessarily encompasses all the information required to enable the Board to render its decision, including the application along with subsequent amendments and supporting data supplied by the applicant, material submitted by protestants, transcripts of hearings, staff reports and recommendations and, as in this case, Department of Justice opinion letters. Since the Board voted to disapprove FWN's application shortly after presentation to it of the staff reports and recommendations, the Corporation contends that it complied with the statute.

The legislative history again provides an insight into the meaning of the disputed provision. The Senate version of the Savings and Loan Holding Company Amendments, S. 1542, 90th Cong., 1st Sess. (1967), originally stated that

> (e)(2) . . . In every case, the Corporation shall render its decision within one hundred and eighty days *from receipt of application* for approval hereunder. . . . 113 Cong.Rec. 17375–76 (1967). (Emphasis added.)

If this version had been enacted, FWN's contention that the Corporation failed to act within the statutory period would be correct. The House Banking and Currency Committee, however, selected a different version. This provided that the Corporation is required to "render its decision within ninety days *after submission to the Board of the complete record* on the application." (Emphasis added.) 12 U.S.C. § 1730a(e)(1)(B) and (e)(2). Since the applicant does not submit a "record" but rather an application, the phrasing of this section as enacted indicates an intention to commence the time period only after the Board has received all relevant supporting information and reports, that is, the completed "record".

The substitution of the word "Board" for "Corporation" in the final version is equally significant. Although the Corporation receives and processes the application initially, the Board, as acting head of the Corporation, has final responsibility for approving applications. Congress intended the time period to commence when the Board, not the Corporation, has the application. This occurs only after the staff completes processing the application and submits the

final record to the Board. In the present case, the record on the application was submitted to the Secretary of the Board on August 13, 1971. The Board disapproved FWN's application at its meeting on August 17, and adopted Resolution 17–836, which became an "order" of the Corporation. The opinion letter and the Resolution were sent to FWN's counsel on August 27. All of these events were well within the ninety day statutory period.

 Even if the ninety day period were not complied with, we would have to disagree with FWN's contention that the Corporation consequently was ousted from jurisdiction. A statutory time period is not mandatory unless it both expressly requires an agency or public official to act within a particular time period and specifies a consequence for failure to comply with the provision. Maryland Casualty Co. v. Cardillo, 1938, 69 App.D.C. 199, 99 F.2d 432, 434; Diamond Match Co. v. United States, U.S. Customs Ct.1960, 181 F.Supp. 952, 958–959; Ward v. Fremont Unified School District, 1969, 276 Cal.App.2d 313, 80 Cal.Rptr. 815, 821.[2]

Section 1730a(e) does not specify any particular consequence for failure to act within the time period. Nor is there anything in the legislative history indicating such an intent. We conclude, therefore, that the provision is directory and that FWN's proper remedy was to apply for a court order compelling the Corporation to act.

 D. In disapproving FWN's application, the Board, acting on behalf of the Corporation, based its decision on its finding that FWN's acquisition would have a significantly adverse effect on competition in the Fort Worth area. FWN challenges this decision on the grounds that (1) the Board incorrectly defined the relevant product market, (2) the Board did not demonstrate that the proposed acquisition would actually lessen competition, and (3) the Board's use of percentage shares of the market in analyzing the anticompetitive effects of the proposed acquisition was improper. After an examination of the record, we conclude that the Board's decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and we therefore affirm. 5 U.S.C. § 706. See Federal Maritime Commission v. Aktiebolaget Svenska Amerika Linien, 1968, 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071; Minneapolis & St. Louis R. Co. v. United States, 1959, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223.

As of December 31, 1970, FWN was the second largest bank in terms of savings deposits in Fort Worth, Texas, and had total assets of approximately $573.5 million and savings deposits under $100,000 each of approximately $90 million. Mutual was the third largest savings and loan association in Fort Worth and had savings accounts of approximately $58.6 million. Within the Fort Worth Standard Metropolitan Statistical Area (SMSA), FWN had 11.8 percent of the market share of savings deposits under $100,000 held by financial institutions. Mutual had 6.6 percent of this market. After the proposed acquisition, FWN would have approximately 17.5 percent of all savings accounts with deposits under $100,000 and would rise from second to first in rank according to its share of the savings market. Furthermore, FWN would have approximately 5.7 percent more of the market than its nearest competitor. The proposed acquisition would also increase the

---

2. As the Court noted in Diamond Match Co. v. United States, 181 F.Supp. at 958–959,

> [a]s a general rule, a statute which provides a time for the performance of an official duty will be construed as directory so far as the time of performance is concerned, especially where the statute fixes the time for convenience or orderly procedure. . . . Statutes fixing the time for performance of acts will ordinarily be held directory where there are no negative words restraining the doing of the act after the time specified and no penalty is imposed for delay.

percentage of savings business done by the three leading banks in the SMSA from 30.8 percent to 37.4 percent.[3]

The statutory standard to be applied under the Act is whether the proposed acquisition would "in any section of the country . . . substantially . . . lessen competition." 12 U.S.C. § 1730a(e)(2). This test is similar to section 7 of the Clayton Act, as amended in 1950, 15 U.S.C. § 18, and the cases construing that section are relevant here. In analyzing the competitive effects of an acquisition or merger under section 7, it is necessary to define (1) a product market, and (2) a geographical market within which competi-

tion for the product exists. The Board determined that the Fort Worth Standard Metropolitan Statistical Area was the relevant geographical market. That decision is not contested by FWN. The Board further concluded that the appropriate product market was savings deposits under $100,000. FWN now contends that the Board erred in comparing the percentage market shares of a commercial bank (FWN) with a savings and loan association (Mutual), that commercial banking is the relevant product market, and that the acquisition would not lessen competition because FWN and Mutual are in different markets. FWN relies primarily on United States v. Philadelphia National Bank, 1963, 374

3. The opinion letter prepared by the Antitrust Division of the Department of Justice contained a similar analysis of the proposed acquisition.

"3. *Effect on Competition*

Savings and loan associations are primarily engaged in two services: acting as depositories for savings and making real estate mortgage loans. On the lending side, their historic lending pattern has been in residential mortgage loans. Commercial banks generally provide a much broader variety of financial services, but are also engaged in soliciting savings deposits and making residential mortgage loans. While there are distinctions in the type and quality of the services offered by each type of institution, with competition increasing or decreasing with changes in economic condition, there is sufficient cross-elasticity of demand so that there is competition for both savings and residential mortgage lending.

Since both institutions operate their offices in Fort Worth, there will be an elimination of substantial actual competition between the parties.

4. *Effect on Concentration*

As of June 30, 1970, there were 35 commercial banks operating in the Fort Worth SMSA. On that date, commercial banks held approximately $1.4 billion in total deposits and about $571 million in IPC time savings deposits. Fort Worth Bank is the largest bank in the Fort Worth SMSA in terms of total deposits and is the second largest bank in terms of IPC time savings deposits.

As of June 30, 1970, it held $125 million in IPC time savings deposits or

approximately 21.8 per cent of all IPC time savings deposits of commercial banks in the SMSA.

As of May 31, 1970, nine savings and loan associations operated 25 offices in the SMSA with approximately $318 million in savings deposits. Mutual Savings is the third largest association with approximately $53 million or 16.8 per cent of all savings deposits held by savings and loan associations with offices in the SMSA.

After the acquisition, Corporation subsidiaries would hold almost 20 percent of all savings deposits held by commercial banks and savings and loan associations in the SMSA. (Fort Worth Bank would hold 14.0 percent and Mutual Savings would hold 5.9 percent of such deposits.) Considering only insured savings deposits, Corporation's share would appear to be even higher, since, according to the application, the bulk of the savings deposits in both Fort Worth Bank and Mutual Savings is in accounts under $25,000.

We do not presently have comparable data for mortgage loans at this time.

5. *Conclusion*

Since it appears that the acquisition will eliminate substantial direct competition between Corporation's subsidiaries and Mutual Savings for savings deposits and residential mortgage loans and will increase concentration in these markets, we conclude that the proposed acquisition will likely have a significantly adverse effect on competition in the City of Fort Worth and in the Fort Worth SMSA."

U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915, and United States v. Phillipsburg National Bank, 1970, 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658. These cases hold that in a merger between two commercial banks, the cluster of products and services offered by full-service banks is the relevant product market. This is not the case, however, in a merger between a commercial bank and a different type of financial institution. In *Phillipsburg National Bank,* for example, the Supreme Court reversed the district court's holding that the relevant product market was not commercial banking but rather a market that included competition from savings and loan associations and other financial institutions. Significantly, the Court noted that the submarkets, defined by the district court "would be clearly relevant, . . . in analyzing the effect on competition of a merger between a commercial bank and another type of financial institution." 399 U.S. at 360, 90 S.Ct. at 2041. Thus, where one of the merging firms offers less than the full line of commercial bank services, the relevant market is defined according to the particular services in which the firms actually compete.

United States v. Continental Can Co., 1964, 378 U.S. 441, 84 S.Ct. 1738, 12 L. Ed.2d 953, supports this view. *In Continental Can Co.,* the nation's second largest producer of metal containers (Continental) acquired the assets of the nation's third largest producer of glass containers (Hazel-Atlas). The defendant corporation, Continental, argued that the acquisition had no anticompetitive effect because the glass and metal container industries were separate lines of commerce. The Supreme Court, however, found that there were some end uses for which both glass and metal competed (containers for baby food, beer, soft drinks, etc.) and that the relevant product market should be defined in terms of these end uses.[4]

The reasoning of *Continental Can Co.* is clearly applicable to the present case. Commercial banks and savings and loan associations compete for savings deposits, and a product market may be defined to reflect the reality of that competition. Although these firms also participate in other product markets, it is sufficient for purposes of the antitrust laws if there is one relevant market in which competition may be substantially lessened.

We also disagree with FWN's contention that the Board was required to demonstrate that the proposed acquisition would result in an actual lessening of competition. As the Supreme Court has said, "[T]he dominant theme pervading congressional consideration of the 1950 amendments [to section 7 of the Clayton Act] was a fear of what was considered to be a rising tide of economic concentration in the American economy". Brown Shoe Co. v. United States, 1962, 370 U.S. 294, 315, 82 S.Ct. 1502, 1518, 8 L.Ed.2d 510, 530. To remedy this situation, Congress provided "authority for arresting mergers at a time when the trend to a lessening of competition . . . was still in its incipiency." *Id.* at 317, 82 S.Ct. at 1520. Application of this standard "requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon

4. The Court stated:
 In defining the product market between these terminal extremes, we must recognize meaningful competition where it is found to exist. Though the "outer boundaries of a product market are determined by, the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," there may be "within this broad market, well defined submarkets . . . which,

 in themselves, constitute product markets for antitrust purposes." Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510, 535, 378 U.S. at 449, 84 S.Ct. at 1743. Where the area of effective competition cuts across industry lines, so must the relevant line of commerce; otherwise an adequate determination of the merger's true impact cannot be made. *Id.* at 457, 84 S.Ct. at 1747.

competitive conditions in the future. . . ." United States v. Philadelphia National Bank, 374 U.S. at 362, 83 S.Ct. at 1741. To require proof of an actual lessening of competition would subvert the congressional intent to restrain anticompetitive tendencies at the outset, rather than after the lessening of competition has become an accomplished fact. This approach seems especially justified in view of the extreme difficulty in restoring competition to markets which have become unduly concentrated as a result of mergers and acquisitions. Divestiture actions are an uncertain remedy. For this reason, the antitrust laws are intended to be preventive as well as curative. We conclude that there is no ground for requiring the Corporation to wait until there has been an actual lessening of competition.

Furthermore, we believe that it was proper for the Board to rely on a comparison of percentage market shares as a basis for analyzing the anticompetitive effects of the acquisition. The Supreme Court addressed this point in *Philadelphia National Bank* and concluded that the "intense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects. Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in the market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." 374 U.S. at 363, 83 S.Ct. at 1741. In its opinion letter, the Board stated that the acquisition of Mutual would result in FWN having approximately 17.5 percent of the relevant market and would increase the percentage of savings business done by the three leading financial institutions from 30.8 percent to 37.4 percent.

In these circumstances, it cannot be said that the Board was arbitrary in concluding that presentation of extensive data on market behavior was unnecessary and that the proposed acquisition was inherently likely to lessen competition.

Since we affirm the order of the Corporation and reverse the decision of the district court, the Corporation is entitled to seek divestiture by FWN of the Mutual stock.

The order of the Corporation is affirmed.