NEW ENGLAND SOUTHERN RAILROAD CO., INC., Plaintiff,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; Andrew L. Lewis, Jr., Secretary of Transportation; Federal Railroad Administration; and, Robert W. Blanchette, Federal Railroad Administrator, Defendants,

Massachusetts Central Railroad Corporation, Intervenor/Crossclaimant,

Pinsly Railroad Corporation, Intervenor.

Civ. A. No. 82–17.

Special Court,
Regional Rail Reorganization Act.

July 28, 1982.

**918**

William V. DePaulo, Bracewell & Patterson, Washington, D. C., for plaintiff New England Southern R. Co.

J. Paul McGrath, Asst. Atty. Gen., Jane A. Restani, Alan E. Kleinburd, Attys, Dept. of Justice, Civ. Div., Washington, D. C. (Grady Cothen, Jr., F. R. A., Dept. of Transp., Washington, D. C., of counsel), for defendant Federal Railroad Administration.

Jerome Nelson, Steven Sarfatti, Washington, D. C. (Schwalb, Donnenfeld, Bray & Silbert, John Heffner, Pepper & Corazzini, Washington, D. C., of counsel), for intervenor/crossclaimant Massachusetts Central R. Corp.

Robert L. Calhoun, Paulette S. Kessler, Sullivan & Worcester, Washington, D. C., for intervenor Pinsly R. Corp.

1. Relief was sought against the Department of Transportation; Andrew L. Lewis, Jr., Secretary of Transportation; the Federal Railroad Administration (FRA); and Robert W. Blan-

Before GASCH, Presiding Judge, and BRYANT and WEINER, Judges.

BRYANT, Judge:

The Federal Railroad Administrator (the Administrator) on May 27, 1982 decided to transfer two railroad lines in Massachusetts to the Pinsly Railroad Company (Pinsly). Two disappointed applicants for the lines, New England Southern (NES) and Massachusetts Central (MC), subsequently moved this court to enjoin the transfer as arbitrary, capricious, and not in accordance with the law.[1] For the reasons stated below, we hold that the Administrator complied with the Regional Rail Reorganization Act of 1973 (the RRRA), § 305(g), as amended by the Northeast Rail Service Act of 1981 (NRSA), § 1155, 45 U.S.C. § 745(g) (1981), when he decided to transfer the lines to Pinsly.

## FACTUAL BACKGROUND

On August 13, 1981, Congress enacted The Northeast Rail Service Act as part of the Omnibus Budget Reconciliation Act. In § 1132 of NRSA, Congress found, *inter alia*, that:

(1) the processes set in motion by the Regional Rail Reorganization Act of 1973 have failed to create a self-sustaining railroad system in the Northeast region of the United States and have cost United States taxpayers many billions of dollars over original estimates;

(2) current arrangements for the provision of rail freight and commuter service in the Northeast and Midwest regions of the United States are inadequate to meet the transportation needs of the public and needs of national security;

(3) although the Federal Government has provided billions of dollars in assistance for Conrail and its employees, the Federal interest in ensuring the flow of interstate commerce through rail service

chette, Federal Railroad Administrator. In this memorandum, we treat the action as being against the Administrator.

in the private sector has not been achieved, and the protection of interstate commerce requires Federal intervention to preserve essential rail service in the private sector;

(4) the provisions for protection of employees of bankrupt railroads contained in the Regional Rail Reorganization Act of 1973 have resulted in the payment of benefits far in excess of levels anticipated at the time of enactment, have imposed an excessive fiscal burden on the Federal taxpayer, and are now an obstacle to the establishment of improved rail service and continued rail employment in the Northeast region of the United States. . . .

In light of these findings, § 1133 declared the following purposes:

It is therefore declared to be the purpose of the Congress in this chapter to provide for—

(1) the removal by a date certain of the Federal Government's obligation to subsidize the freight operations of Conrail;

(2) transfer of Conrail commuter service responsibilities to one or more entities whose principal purpose is the provision of commuter service; and

(3) an orderly return of Conrail freight service to the private sector.

Among the many specific actions mandated by NRSA was the divestiture of two lines in Massachusetts owned by the Consolidated Rail Corporation (Conrail)—the Holyoke and Florence secondary lines. As added by § 1155(c) of NRSA, § 305(g)(1) directed the Secretary of Transportation to initiate discussions regarding the transfer of these lines within 20 days after NRSA's effective date. Section 305(g)(2) further directed:

Within 120 days after the effective date of the Northeast Rail Service Act of 1981, the Secretary shall transfer, provided a qualified purchaser offers to purchase, the Corporation's properties and freight service obligations described in paragraph (1) of this subsection to another railroad or railroads in the Region

which are determined by the Secretary to be qualified. A qualified purchaser is defined as a railroad financially self-sustaining which guarantees continuous service for at least four years.

The Secretary of Transportation delegated the Federal Railroad Administrator to perform the Secretary's tasks under NRSA. On September 22, 1981, the FRA issued its public notice of submission requirements for parties interested in acquiring the Holyoke and Florence lines. Two companies submitted proposals—New England Southern, a corporation formed for the purpose of procuring and operating a short line railroad in Massachusetts, and Massachusetts Central, operator of the Ware River railroad line under contract with the Commonwealth of Massachusetts.

On December 11, 1981, the last day of the 120-day period prescribed by § 305(g), the Administrator found that neither NES nor MC was a qualified purchaser for the Holyoke and Florence lines within the meaning of NRSA. The Administrator determined, however, that NES was more likely than MC to become a qualified purchaser. The Administrator decided to transfer the Holyoke and Florence lines to NES not later than March 1, 1982, subject to the performance of several conditions precedent, including acquisition of adequate financing. The Administrator stated that if NES failed to meet the March 1 deadline, the negotiations would be reopened.

NES was unable to meet the March 1 deadline. At NES' request, the Administrator gave NES an extension of time until March 31 to perfect its financing. NES was unable to meet the new deadline. Consequently, on March 31, 1982, the Administrator announced that he would reopen the transfer process, without prejudice to a renewed NES proposal.

In the second round, both NES and MC submitted new purchase proposals. In addition, Pinsly Railroad Company, a holding company for railroads, submitted a purchase proposal on behalf of the Pioneer Valley Railroad Co., Inc. (Pioneer Valley), a wholly-owned subsidiary which Pinsly

planned to establish in order to acquire the Holyoke and Florence lines. Even though NES on May 25 achieved compliance with the conditions precedent contained in the Administrator's December 11 order, the Administrator decided on May 27 to transfer the Holyoke and Florence lines to Pinsly. The Administrator subsequently denied MC's motion for reconsideration of the May 27 decision.

## PROCEDURAL BACKGROUND

On June 10, 1982, NES filed a complaint for declaratory and injunctive relief asking us to determine that § 305(g)'s 120-day deadline rendered the Administrator powerless to reopen the award process after December 11, 1981. NES' complaint also asks us to reverse the Administrator's decision to award the lines to Pinsly, and to enjoin transfer of the lines to any party other than NES now that NES has achieved the requisite financing. On June 15, Pinsly and MC were granted leave to intervene in the action filed by NES.

Pinsly asks us to uphold the Administrator's decision. MC's objections are predicated on our deciding the 120-day deadline issue adversely to NES. In its June 24 motion for a temporary restraining order, MC contends that the Administrator's decision to transfer the Holyoke and Florence lines to an as yet nonexistent subsidiary of Pinsly was not in accordance with the § 305(g) mandate that the lines be transferred to a "railroad in the Region." Moreover, MC contends that the award was arbitrary and capricious because (1) the Administrator failed to take necessary steps to prevent Mr. Harold Levine, an FRA official and the ex-husband of Pinsly's president and father of Pinsly's vice-president, from participating in the transfer proceedings; (2) the Administrator based his decision to transfer the lines to Pinsly upon confidential data which MC sought but was denied; (3) the FRA failed to adhere to the submission requirements governing the transfer proceedings and departed from past practice of requiring compliance by applicants with submission guidelines; and (4) the Ad-

ministrator failed to consider (a) Pinsly's record of past rail service, (b) the preference of shippers on the lines for MC, and (c) the weakness of Pinsly's commitment to maintain four years' continuous service on the lines.

On June 29, 1982, we heard oral argument on NES' and MC's requests for preliminary relief, and on June 30, 1982, we issued an order denying the preliminary relief requested by MC and NES but staying the operation of the transfer order pending the outcome of a ten-day remand to the FRA. Our order directed the Administrator to disclose to the attorneys and consultants of the parties, under an appropriate protective order, the confidential financial statements submitted by Pinsly. The order also directed the Administrator to clarify what, if any, participation Mr. Levine had with respect to the Administrator's decision to transfer the Holyoke and Florence lines to Pinsly.

Our motivation in issuing the remand order was a practical one. The Administrator submitted affidavits of staff members other than Mr. Levine stating that Mr. Levine had no significant participation in the transfer decision. The Administrator also pointed out that all parties who made bids took advantage of the opportunity to submit confidential data. Finally, the Administrator asserted that his decision to award the Holyoke and Florence lines to Pinsly was supported by substantial evidence in the public record, including accountants' statements verifying the confidential Pinsly data. While the Administrator's arguments appeared convincing, the remand promised to assure the court and all the parties that no ethical boundaries were transgressed and no procedural corners were cut.

The remand has largely accomplished that purpose. On July 12, the Administrator filed his report with the court. As a result of that report, MC and the court are satisfied that Mr. Levine's involvement in the transfer process was neither personal nor substantial and resulted in no actual

wrongdoing.[2] The court is also satisfied that, as a result of the procedures established by the protective order entered July 2, MC has had an adequate opportunity to contest the evidence upon which the Administrator relied to award the lines to Pinsly.[3]

The remand has also narrowed the issues still before the court. Although on July 16 MC filed a motion for reversal and remand of the Administrator's decision, that motion raises no new issues. It remains for us to address NES' 120-day deadline claim, and if we decide that claim adversely to NES, to address MC's claims that Pinsly is not a "railroad in the Region" and that the Administrator's designation of Pinsly was arbitrary and capricious. Since all issues in this case have by now been fully briefed, we dispose of the parties' pleadings on the merits.

## SECTION 305(g)'s 120-DAY DEADLINE

Section 305(g)(2) provides:

> Within 120 days after the effective date of the Northeast Rail Service Act of 1981, the Secretary shall transfer, provided a qualified purchaser offers to purchase, the Corporation's properties and freight service obligations ... to another railroad or railroads in the Region which are determined by the Secretary to be qualified. A qualified purchaser is defined as a railroad financially self-sustaining which guarantees continuous service for at least four years.

The 120-day period specified in the statute ended on December 11, 1981. NES contends that the Administrator's December 11 decision to award NES the lines if NES satisfied certain conditions constituted a § 305(g) "transfer" which the Administrator was bound to effect once those conditions were satisfied. NES further asserts that the Administrator exceeded his statutory authority when on May 27, 1982 he decided to transfer the Holyoke and Florence lines to Pinsly.

To determine whether § 305(g)'s 120-day provision is mandatory or directory, we must explore Congress' intent in enacting the provision, and consider whether construing the provision as mandatory would effectuate or frustrate that intent. "Statutes that, for guidance of a governmental official's discharge of duties, propose 'to secure order, system, and dispatch in proceedings' are usually construed as directory, whether or not worded in the imperative, especially when the alternative is harshness or absurdity." *Ralpho v. Bell*, 569 F.2d 607, 627 (D.C.Cir.1977) (footnotes omitted). Ordinarily, a statutory time period is not mandatory unless it specifies a consequence for failure to comply with the provision. *Fort Worth National Corp. v. Federal Savings & Loan Insurance Corp.*, 469 F.2d 47, 58 (5th Cir. 1972) (citations omitted).

NRSA contains numerous deadlines. The § 305(g) deadline, as well as the § 305(f)(2) deadline for transfer of Conrail's Connecticut and Rhode Island lines, is shorter than the deadline for the disposition of other

**2.** In comments submitted to the FRA during the course of the remand, MC stated, "MC concedes that no actual wrongdoing has been shown. In fact, it appears from the interviews that Mr. Levine's involvement in the transfer process was neither personal nor substantial within the meaning of 49 C.F.R. § 99.735–15(a)."

**3.** In response to our remand order, MC submitted on July 14, 1982 "Preliminary Comments and Motion for Modification of Protective Order and for Extension of Time in which to File Further Comments." MC requested that we give MC's president access to the sealed report the Administrator filed on remand comparing MC data with Pinsly data. We denied MC's motion in our July 16 order

vacating the stay of the transfer of the lines. The Administrator dismissed MC's contentions because he found that "MC's basic argument is not that Pinsly is without substantial assets and reasonable liquidity in relation to this transaction." The Administrator's determination had substantial evidence in the record available to MC—namely, MC's July 7, 1982 submission. The Administrator in his sealed supplementary report took the extra step of demonstrating that MC's critique of Pinsly's overall financial position was defective and misleading. Even if MC's president showed that MC's critique was flawless, his showing would not affect the validity of the Administrator's conclusion with respect to Pinsly's assets and liquidity in relation to this transaction.

Conrail lines in other states. The shorter deadlines of §§ 305(f) and (g) reflect the unique circumstances of the railroads in the areas affected by those sections. Senator Pell, in Senate debate about § 305(f)(2) expedited supplemental transactions, advocated an early deadline because "heavy surcharges, deteriorating track, and the possibility of numerous abandonments . . . [create] a very real possibility that freight service in this region will disappear entirely if a solution is deferred until the administration plan for Conrail is implemented." 127 Cong.Rec. S7063 (daily ed. June 25, 1981). On another occasion, Senator Pell said "[a] triggering mechanism is needed in this legislation to require that new proposals for southern New England go forward. . . ." Northeast Rail Service Act of 1981: Hearing Before the Surface Transportation Subcommittee of the Senate Commerce, Science and Transportation Committee, 97th Cong., 1st Sess. 32 (June 17, 1981).

NRSA's amendment of § 305(g) was inserted at the House-Senate conference and was not debated or discussed in either the House or Senate. "Explanatory Statement of House and Senate Conferees on Omnibus Budget Reconciliation Act of 1981," 127 Cong.Rec. H5956, H5965 (August 4, 1981). However, a letter from § 305(g)'s sponsor, Congressman Silvio Conte of Massachusetts, to the Secretary of Transportation written after enactment of NRSA shows that § 305(g) was motivated by circumstances similar to the circumstances which motivated § 305(f)(2). Congressman Conte wrote that as a result of Conrail fees and surcharges "[i]f other railroads, which are interested in purchasing the lines, are required to wait until 1983 to purchase, it is my contention that shipping volume will deteriorate to such a low level as to preclude any sale." Transcript of public meeting of September 1, 1981, Springfield, Mass.; copy of excerpt attached as Exhibit F to Administrator's Response of June 21, 1982. While a *post hoc* interpretation of congressional intent is not generally entitled to great weight, in this case it probably accurately reflects the legislative intent.

Senator Pell's and Congressman Conte's remarks demonstrate that the NRSA amendments to § 305 aim to provide continued and reliable rail service to New England shippers. Congress wished to encourage a speedy transfer of Conrail's New England lines to the private sector lest the lines be abandoned before they could be sold. At the same time, Congress wished to ensure that the lines' new operators would be capable of sustaining the lines for more than a short period of time. To achieve these goals with respect to the five Massachusetts lines, Congress in § 305(g) fashioned the 120-day "trigger mechanism," but also conditioned the 120-day deadline upon the offer to purchase of a "qualified purchaser" who could guarantee continuous service for at least four years. Congress enacted no sanction for failure to comply with the 120-day deadline.

The fact that the 120-day deadline has no sanction attached suggests that Congress intended the provision to be directory. Moreover, construction of § 305(g)'s 120-day deadline as mandatory, rather than directory, would frustrate Congress' intent. There are two ways to construe the statute as mandatory, each of which results in a harsh and absurd alternative.

The first construction—the construction more plausible to us—arises from a literal reading of the statute. The statute mandates transfer of the lines to a qualified purchaser within 120 days after NRSA's effective date. If no qualified purchaser came forward by December 11, 1981, the Secretary was powerless to effect a transfer after that date. Construction of the statute in this fashion leads to the conclusion that the railroads should have remained Conrail's. This alternative clearly violates the drafters' intent to divest Conrail of responsibility for the lines.

The second construction, advanced by NES, would permit a transfer on December 11, 1981 to an identifiable transferee, to be effected when the transferee satisfied the conditions specified for the transfer. In this instance NES fulfilled the necessary conditions by May 25, 1982. But the logical

extension of NES' argument would result in the saddling of Conrail with the lines and the saddling of shippers with Conrail's fees and surcharges, until the day came, if it came at all, when the transferee finally fulfilled the requisite conditions. It is unlikely Congress intended the Administrator to remain passive after December 11, not knowing when, if ever, NES would comply with his conditions, if by reopening the bid process the Administrator might find a qualified purchaser at a new date certain.

■ While construction of the § 305(g) deadline as mandatory extends undue importance to the deadline at the expense of § 305(g)'s overriding goals, construction of the deadline as directory achieves a balance between the congressional aim of eliminating delay and the aim of ensuring the future vitality of Massachusetts' railroads. *See Baltimore & O. C. T. R. Co. v. United States*, 583 F.2d 678, 690 (3d Cir. 1978). At the same time, construction of the 120-day deadline as directory does not frustrate any policies advanced in other sections of NRSA, since no events other than the transfer of the Massachusetts railroads hinge on the § 305(g) deadline. Finally, construing the deadline as directory does not prejudice NES, unless depriving NES of its claimed privilege of "locking in" the award as of December 11, 1981 is deemed prejudice. *See id.* We uphold the Administrator's decision to reopen the bid process and transfer the Holyoke and Florence lines to Pinsly after NES failed to become a "qualified purchaser" during the period specified by the Administrator.

## SECTION § 305(g)'s "RAILROAD IN THE REGION" LANGUAGE

Since we hold that the Administrator was empowered to reopen the transfer process and designate a new transferee after December 11, 1981, we now consider MC's claims that the Administrator's decision to transfer the Holyoke and Florence lines to Pinsly was arbitrary, capricious, and not in accordance with the law.

NRSA § 1155, which added § 305(g) to the RRRA, requires the Secretary of Transportation to transfer Conrail's lines "to another railroad or railroads in the Region." "Railroad" is defined as "a common carrier by railroad as defined in section 1(3) of part I of the Interstate Commerce Act (49 U.S.C. 1(3))." RRRA, § 102(13). "Region" includes, *inter alia*, the New England states of Maine, Vermont, Massachusetts, Connecticut, and Rhode Island. RRRA, § 102(15).

The Administrator found that the Pinsly subsidiary Pioneer Valley, constituted and capitalized according to Pinsly's proposal, will be at the time of the transfer a "railroad in the Region." MC contends that the Administrator's interpretation of the "railroad in the Region" requirement effectively reads the "in the Region" language out of the statute, and contravenes what MC terms the "regionalist philosophy" of NRSA.[4]

■ When faced with a problem of statutory construction, the court should respect the Administrator's reasonable interpretation of the statute. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The Administrator asserts that the whole thrust of the RRRA has been not to shore up failing railroad companies, but to assure rationalization of the rail system and preservation of essential service. All the statutory sections cited by MC—for example, the statement of legislative purpose about "the reorganization of railroads in this region into an economically viable system capable of providing adequate and efficient rail service to the region," RRRA, § 101(b)(2)—can be interpreted as referring either to already-existing railroads in the region, or to railroads to be introduced into the region's rail system. The sections cited by MC, however, unequivocally emphasize the need to provide effective service. The Administrator's determination that § 305(g) permits him to award the Holyoke

---

4. The court notes that MC did not raise this contention until MC petitioned the Administrator for reconsideration of the award to Pinsly,

even though in the first round MC lost out to NES, a company formed for the sole purpose of acquiring the Holyoke and Florence lines.

and Florence lines to any entity which will be a "qualified purchaser" and "railroad in the Region" on the date of transfer is therefore reasonable and consistent with NRSA's purposes.

Consideration of the actual transfer process in this case reinforces the reasonableness of the Administrator's interpretation of § 305(g). Had MC not applied to take over the lines, MC's definition would still have precluded Pinsly and NES from designation as "railroads in the Region." Congress undoubtedly knew that there would be few applicants for the five lines in Massachusetts governed by § 305(g). Congress could not have intended that the lines remain with Conrail rather than be transferred to a newly-formed railroad.

MC argues that comparison of § 305's mandated transfers to "railroads in the Region" with legislation concerning other transfers of Conrail lines and legislation concerning the Milwaukee and Rock Island railroads demonstrates that Congress knew how specifically to provide for both existing railroads and non-existent railroads, but purposely failed to do so in § 305. Compare RRRA § 305 with RRRA, §§ 401 et seq., 45 U.S.C. § 902(a), and 45 U.S.C. § 1003(a)(2). Section 305(g) was introduced during the House-Senate conference on the Omnibus Budget Reconciliation Act by Congressman Silvio Conte, in whose district lie four of the five lines affected by the section. Section 305(g) was not debated or discussed in either the House or Senate. Comparison of statutory terms is hardly probative where there is evidence that Congress did not have the opportunity carefully to choose and weigh its words. We therefore uphold the Administrator's finding that Pinsly's Pioneer Valley subsidiary qualifies as a "railroad in the Region" within the meaning of § 305(g).

## REVIEW OF THE ADMINISTRATIVE RECORD

MC alleges that a host of procedural irregularities taints the Administrator's deci-

sion to award the Holyoke and Florence lines to Pinsly. MC also alleges that the award to Pinsly was arbitrary and capricious because the Administrator improperly evaluated the strengths and weaknesses of MC's and Pinsly's applications.

The court's standard of review is limited. Having resolved the statutory interpretation issues presented by this case, our task now is only to determine whether there was substantial evidence in the record for the Administrator's decision to transfer the Holyoke and Florence lines to Pinsly. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–286, 95 S.Ct. 438, 441–442, 42 L.Ed.2d 447 (1974); *National Small Shipments v. Civil Aeronautics Board*, 618 F.2d 819, 826–827 (D.C.Cir.1980).

MC set forth its objections to the Administrator's action in a lengthy petition for reconsideration. The Administrator answered those objections in an equally lengthy decision denying that petition. The Administrator's detailed exposition of the bases for his decision demonstrates that the decision was based on substantial evidence and was made in accordance with law. The thoroughness of the Administrator's exposition makes it unnecessary for us to address MC's specific claims in this memorandum.

## CONCLUSION

The Administrator's May 27, 1982 decision to transfer the Holyoke and Florence lines to Pinsly Railroad Company is affirmed. Judgment will be entered dismissing NES' complaint and MC's cross-claim.