**CONSOLIDATED RAIL CORPORATION,**
Petitioner,

v.

**DELAWARE AND HUDSON RAILWAY**
**CO., Respondent,**

Interstate Commerce Commission,
Intervenor.

No. 82–13.

Special Court,
Regional Rail Reorganization Act.

July 12, 1982.

Barbara W. Mather, Thomas E. Zemaitis, Joyce K. Hackenbrach Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Consolidated Rail Corp.

.William P. Quinn, Nicholas J. Scafidi, Eric M. Hocky, Rubin, Quinn, Moss & Girard-diCarlo, Philadelphia, Pa., and George H. Kleinberger, Albany, N. Y., for Delaware and Hudson Ry. Co.

John Broadley, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, John J. McCarthy, Jr., Atty., I. C. C., Washington, D. C., for intervenor.

FRIENDLY, Presiding Judge:

In this action Consolidated Rail Corporation (Conrail) asks us to stay all proceedings before the Interstate Commerce Commission (ICC) in Finance Docket No. 29,802, *Delaware and Hudson Railway Company v. Consolidated Rail Corporation—Petition to Require Reciprocal Switching Agreement,* on the ground that the subject matter of those proceedings is within the original and exclusive jurisdiction of this Court under §§ 209(e)(1)(C) and 209(e)(2) of the Regional Rail Reorganization Act of 1973 (RRRA). The Delaware and Hudson Railway Company (D&H), joined by intervenor—ICC, opposes Conrail's petition on the ground that the matter before the ICC is outside our exclusive jurisdiction.

The determinative facts are undisputed: At present D&H's only access to Philadelphia, Pa., is by way of overhead trackage rights[1] on Conrail-owned tracks. These trackage rights were granted D&H by a supplemental designation under the Final System Plan (FSP), 41 Fed.Reg. 8849 (March 1, 1976). Specifically, the designation to the D&H provides as follows:

[a] Overhead trackage rights over those portions of the Reading System from Allentown Burn (MP–35.4) to Park Jct. (MP–2.4) as more specifically detailed on page 316 of Vol. 1 of the FSP, including the right to:

(i) Interchange at Philadelphia with B&O at Park Jct. and the Corporation at a location to be agreed on by D&H and the Corporation; and

(ii) The right, free from the need for any other regulatory authority, to contract with the Corporation for the handling of D&H traffic in blocks of cars and trains of cars with or without D&H locomotives and cabooses between Allentown and Park Jct. or other point or interchange in Philadelphia, on reasonable terms based on actual costs.[2]

Our March 25, 1976 conveyance orders directed the Reading Company and East Pennsylvania Railroad to convey, effective April 1, 1976, the fee ownership of the described properties to Conrail and the overhead trackage rights to D&H. On April 25, 1979, the two railroads executed an agreement conforming to this designation and specifically providing that, with exceptions not here relevant, "D&H shall not perform any local freight service on the joint lines".

Apparently, although Conrail's petition does not make this altogether clear, D&H made unsuccessful representations to USRA at various times that it should be permitted to serve Philadelphia shippers directly. Apparently also, although the petition again does not make this entirely clear, D&H unsuccessfully requested the Secretary of Transportation or USRA to develop a proposal for a supplemental transaction under § 305(a) which would provide it with direct entry to Philadelphia.[3] However, in

---

1. In the Final System Plan, I FSP 286, and the December 1, 1975, Official Errata Supplement at 26, the United States Railway Association (USRA) defined "overhead trackage rights" and distinguished them from "unrestricted trackage rights" as follows:

"Overhead trackage rights" permit the railroad to operate trains over a particular line of railroad but not to serve shippers, sidings, or team tracks located along that line of railroad. "Unrestricted trackage rights" include the right to serve shippers, sidings and team tracks located along the line of a railroad as well as the right to operate through trains over the line.

2. The FSP had contemplated that the Chessie System would acquire the Reading properties described in this supplemental designation. However, Chessie, faced with difficulties arising from the labor protection provisions of RRRA, decided not to accept the properties designated to it. A supplemental grant of overhead trackage rights over the Reading properties here in question thus became necessary in order to preserve D&H's "friendly western and southern connections and prevent its isolation by Conrail". 41 Fed.Reg. 8849.

3. Precisely what D&H requested and to whom it directed its requests are subjects of some dispute between the parties. On the view we take of this action, however, we need not deter-

D&H's view, another string was added to its bow in 1980 when, in Section 223 of the Staggers Act, Congress amended the Interstate Commerce Act by adding what is now 49 U.S.C. § 11103(c)(1), 94 Stat. 1929. This reads as follows:

(c)(1) The Commission may require rail carriers to enter into reciprocal switching agreements, where it finds such agreements to be practicable and in the public interest, or where such agreements are necessary to provide competitive rail service. The carriers entering into such an agreement shall establish the conditions and compensation applicable to such agreement, but, if the carriers cannot agree upon such conditions and compensation within a reasonable period of time, the Commission may establish such conditions and compensation.

In August 1981 D&H requested Conrail to enter into a reciprocal switching agreement providing access to all industries and port facilities within the City of Philadelphia as well as to the Philadelphia Belt Line Railroad.[4] Conrail having declined, the D&H, in December 1981, filed with the ICC its petition, Finance Docket No. 29,802, seeking an order compelling Conrail to accord such rights and establishing reasonable compensation terms if the carriers should prove unable to agree. Conrail responded by filing this action for a stay on April 28, 1982.

At the outset we must determine whether we have jurisdiction to entertain Conrail's petition. Inasmuch as Conrail is not here "challenging the legality of any

action of [USRA], or any failure of [USRA] to take any action"—indeed Conrail applauds USRA's granting only overhead trackage rights to D&H—our jurisdiction is not sustained by § 209(e)(1)(C). Moreover, we find nothing in RRRA giving us jurisdiction to review the refusal of the Secretary of Transportation or USRA to develop a proposal for a supplemental transaction under § 305(a); in any event, Conrail is not complaining of this. The sole basis for jurisdiction apparent to us stems from Conrail's claim that D&H's petition before the ICC in effect requests a significant modification of the conveyance orders issued pursuant to an FSP designation, and thus invades this Court's original and exclusive jurisdiction under § 209(e)(2) of the RRRA.[5] By its petition for reciprocal switching at Philadelphia, the D&H, Conrail contends, is effectively requesting that the earlier conveyance of overhead trackage rights be amended and a conveyance of unrestricted trackage rights be made in its place, see note 1, *supra*. Such a substitution, Conrail further contends, by making the D&H a competitor within the Philadelphia market, would subvert the goals of the FSP inasmuch as the FSP envisaged that the D&H should be able to serve Philadelphia industries only to the extent that Conrail was willing to enter into joint rates.

The Supreme Court has frequently warned lower federal courts against dismissing a claim for want of jurisdiction simply because the court does not believe it to be one on which relief can be granted.

mine whether D&H's previous requests differed from its present petition before the ICC or whether these requests were addressed to USRA, the Secretary of Transportation, or both. Nor need we decide whether, as urged by D&H, USRA's authority to develop supplemental transactions under § 305(a) is limited to proposals involving the transfer of rail property to Conrail or from Conrail to a subsidiary.

4. The ICC has defined "reciprocal switching" as follows, Switching Charges and Absorption Thereof at Shreveport, La., 339 I.C.C. 65, 70 (1971):

In practice ... [reciprocal switching] means that one line-haul carrier operating within the terminal area will act only as switching carrier in placing cars at industries on its

own trackage for loading or unloading, as an incident of the line-haul movement of those cars over another carrier whose trackage in that terminal area does not extend to the serviced industry.

This court intimates no position on the issue whether the arrangement sought by the D&H is "reciprocal"—an issue for consideration by the ICC.

5. Under § 209(e)(2) this Court has original and exclusive jurisdiction over "any action ... to interpret, alter, amend, modify, or implement any of the orders entered by [the Court] ... in order to effect the purposes of this Act or the goals of the Final System Plan."

It suffices to cite *The Fair v. Kohler Die and Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913); *Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946); *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951); *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 279, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 71–72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978); and *Burks v. Lasker*, 441 U.S. 471, 476 n.5, 99 S.Ct. 1831, 1836 n.5, (1979). The success of Conrail's complaint turns on whether the conveyance orders preclude action by the ICC pursuant to new legislation that is inconsistent with the orders. Whatever the ultimate decision, the presentation of this question for the first time involves an issue of the interpretation of the FSP and the conveyance orders thereunder sufficiently substantial to afford us jurisdiction under § 209(e)(2) to consider Conrail's petition for a stay.

█ We are convinced, however, that Conrail's claim that the ICC is precluded from considering D&H's petition is not one on which relief can be granted under F.R. Civ.P. 12(b)(6). The Staggers Act made substantial revisions to the Interstate Commerce Act. Section 101(a) of the Staggers Act, 49 U.S.C. § 10101a, stated the policy of the United States in regulating the railroad industry. One element of this policy was:

(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense.

Consistently with that policy Congress amended 49 U.S.C. § 11103, which since 1978 had empowered the ICC to require joint use of terminal facilities, P.L. 95–473, 92 Stat. 1419, by adding paragraph (c), the relevant portion of which we have already quoted. The Conference Report explained the purpose of the amendment as follows, H.R.Rep.No.96–1430, 96th Cong., 2d Sess. (1980) at 116, reprinted in 1980 U.S.Code Cong. & Adm.News, 3978 at 4148:

In many parts of the country, reciprocal switching agreements are in effect where carriers pick up and deliver traffic for other railroads. In areas where reciprocal switching is feasible, it provides an avenue of relief for shippers where only one railroad provides service and it is inadequate. The standard "practicable and in the public interest" is the same standard the Commission has applied in considering whether to order the joint use of terminal facilities.

We see nothing in the language of § 11103(c)(1), or in its legislative history, to indicate that Congress intended to deny the ICC authority to require reciprocal switching whenever the competitive position of Conrail, or any other railroad which had acquired property rights under the FSP, would be adversely affected. The authority conferred on the ICC by § 11103(c)(1) is nationwide; there is nothing to indicate that Conrail or other railroads in the northeast that had acquired property pursuant to the FSP were to be outside its ambit. Neither do we find anything to support Conrail's assertion that a railroad seeking to add to its rights under the FSP to Conrail's damage must obtain a supplemental transaction under § 305 of RRRA rather than invoke the ICC's power under § 11103(c)(1). Enactment of the Staggers Act differentiates this case from *Consolidated Rail Corp. v. Pittsburgh & Lake Erie Railroad Company*, 459 F.Supp. 1013 (Sp.Ct.RRRA 1978), relied on by Conrail, where the ICC had been asked to issue an order declaring the meaning of the FSP.

This does not mean that the policy arguments advanced by Conrail are irrelevant; it means only that they should be raised before the ICC rather than before us. In passing upon D&H's request for a reciprocal switching agreement, the ICC is directed by § 11103(c)(1) to determine whether such an agreement would be "practicable and in the public interest" or "necessary to provide competitive rail service." It is to be expected that in applying these criteria the ICC will take into consideration, among other

things, whether the agreement here proposed by D&H would unduly weaken Conrail and thereby jeopardize a sizeable public investment and that the ICC will also take into proper account that USRA, notwithstanding the directive with respect to competition in RRRA § 206(a)(5), declined to afford D&H direct entry into Philadelphia in the supplement added to the FSP pursuant to § 208(d)(3)(A). These, however, are questions for the ICC to determine in F.D. No. 29,802 in the first instance, subject to the judicial review accorded generally to its orders, 28 U.S.C. § 2321—not something for this court to determine as a matter of law in advance of appropriate administrative proceedings. The notion that Congress conceived of the RRRA as granting properties conveyed thereunder complete immunity from future adverse developments as the

result of ICC action under new or existing legislation is unacceptable as a matter both of language and of good sense. Equally unacceptable is the notion that the pattern of rail service established by the FSP can be altered only by supplemental transactions pursuant to § 305 and not by proceedings under legislation of general applicability.[6]

The clerk shall enter judgment dismissing the complaint for failure to state a claim upon which relief can be granted.

---

**6.** In reaching these conclusions we have not found it necessary to rely upon the provision in § 304(g) of RRRA, entitled "Abandonment by Corporation", which reads in part:

The Commission may, at any time after the effective date of the final system plan, authorize additional rail service in the region . . . .