765 F.2d 210
 246 U.S.App.D.C. 341
 EDISON ELECTRIC INSTITUTE, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Association of American Railroads, Tampa Electric Company,
Carolina Power & Light Company, Western Coal Traffic League,
Alabama Power Company, et al., Eastern Coal Transportation
Conference, Intervenors.
EDISON ELECTRIC INSTITUTE, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Tampa Electric Company, Association of American Railroads,
Duke Power Company, Carolina Power & Light
Company, Commonwealth Edison Co., et
al., Intervenors.
ALABAMA POWER COMPANY, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Commonwealth Edison Co., et al., Intervenors.
WESTERN COAL TRAFFIC LEAGUE, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
EASTERN COAL TRANSPORTATION CONFERENCE, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
 Nos. 84-1044, 84-1122, 84-1123, 84-1151 and 84-1152.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 15, 1985.
Decided June 21, 1985.
As Amended June 21 and Sept. 18, 1985.
 
 Petitions for Review of an Order of the Interstate Commerce commission.
 John R. Molm, Atlanta, Ga., with whom Robert P. Edwards, Jr., Charles V. Gerkin, Jr., Atlanta, Ga., Leonard M. Trosten, Harry H. Voigt and Michael F. McBride, Washington, D.C., were on the brief, for petitioners in Nos. 84-1044 et al. William L. Slover, Donald G. Avery and C. Michael Loftus, Washington, D.C., entered appearances for petitioners in Nos. 84-1151 and 84-1152.
 Laurence H. Schecker, Atty., I.C.C., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen.Dept. of Justice, Robert S. Burk, Acting Gen. Counsel, Lawrence H. Richmond, Deputy Associate Gen. Counsel, I.C.C., John J. Powers, III and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents in Nos. 84-1044 et al. Barry Grossman, Washington, D.C., entered an appearance for respondents.
 
 
 1
 Kenneth P. Kolson, Washington, D.C., with whom Robert B. Batchelder, Omaha, Neb., Emried D. Cole, Jr., Jacksonville, Fla., James L. Howe, III, Richmond, Va., Thormund A. Miller, San Francisco, Cal., Charles C. Rettberg, Jr., Cleveland, Ohio, Donald L. Turkal, Washington, D.C., Stuart E. Vaughn and Richard E. Weicher, Chicago, Ill., were on the brief, for intervenor Association of American Railroads in Nos. 84-1044 and 84-1122.
 
 
 2
 John F. Donelan, Washington, D.C., Frederic L. Wood and John F. Donelan, Jr., Washington, D.C., entered appearances for intervenors Carolina Power & Light Company and Tampa Electric Company in Nos. 84-1044 and 84-1122 and Duke Power Company in No. 84-1122.
 
 
 3
 C. Michael Loftus and Kelvin J. Dowd, Washington, D.C., entered appearances for intervenor Eastern Coal Transportation Conference in No. 84-1044.
 
 
 4
 William L. Slover and Donald G. Avery, Washington, D.C., entered appearances for intervenor Western Coal Traffic League in No. 84-1044.
 
 
 5
 John R. Molm, Robert P. Edwards, Jr. and Charles V. Gerkin, Jr., Atlanta, Ga., entered appearances for intervenors Alabama Power Company, et al. in No. 84-1044.
 
 
 6
 Charles J. McCarthy and John M. Cutler, Jr., Washington, D.C., entered appearances for intervenors Commonwealth Edison Company, et al. in Nos. 84-1122 and 84-1123.
 
 
 7
 Before TAMM, WALD and BORK, Circuit Judges.
 
 
 8
 Opinion for the Court filed by Circuit Judge BORK.
 
 BORK, Circuit Judge:
 
 9
 The petitioners in these consolidated cases[1] challenge four final orders issued by the Interstate Commerce Commission ("Commission" or "ICC") in the course of ongoing proceedings in Ex parte No. 290 (Sub-No. 2), Railroad Cost Recovery Procedures. Each of the orders[2] involves the same underlying issue: whether the Northeast Rail Service Act of 1981 ("NERSA") requires an adjustment to the Rail Cost Adjustment Factor ("RCAF"), which, under the provisions of the Staggers Rail Act of 1980 ("Staggers Act"), allows rail carriers to increase rates by an amount equal to periodic increases in the RCAF without regulatory review by the Commission. Specifically, petitioners challenge on several grounds the Commission's decision that NERSA requires that the RCAF be calculated using the higher labor costs Consolidated Rail Corporation ("Conrail") rather than the higher labor costs Conrail would pay if its costs were determined in accordance with the national contract levels applicable to other railroads rather than the actual costs of Conrail. We conclude that we lack jurisdiction to review the ICC's orders because petitioners' challenge falls within the exclusive jurisdiction of the Special Court, Regional Rail Reorganization Act ("Special Court"), and we accordingly transfer these cases to the Special Court.
 
 I.
 
 10
 Section 203 of the Staggers Act, Pub.L. No. 96-448, 94 Stat. 1895 (1980), defines the RCAF as
 
 
 11
 a fraction, the numerator of which is the latest published Index of Railroad Costs (which index shall be compiled or verified by the Commission, with appropriate adjustments to reflect the changing composition of railroad costs, including the quality and mix of material and labor), and the denominator of which is the same index for the fourth quarter of 1980, or for the fourth quarter of 1982 or for the fourth quarter of every fifth year thereafter, as appropriate.
 
 
 12
 49 U.S.C. Sec. 10707a(a)(2)(B) (1982). Under the Staggers Act the railroads, including Conrail, are in effect automatically allowed to increase rates by an amount equal to quarterly increases in the RCAF, because such rate increases "may not be found to exceed a reasonable maximum for the transportation involved." 49 U.S.C. Sec. 10707a(b)(2). Hence, "[t]hose rate increases that simply follow the [RCAF] inflation adjustment formula are immune from attack." Western Coal Traffic League v. United States, 677 F.2d 915, 918 (D.C.Cir.),cert. denied, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982) (citation omitted). The RCAF, then, serves as "a rapid mechanism for translating cost increases into rate increases." 677 F.2d at 926.
 
 
 13
 NERSA, Pub.L. No. 97-35, Sec. 1132 et seq., 95 Stat. 357, 644 (1981), removed federal subsidies from Conrail's freight operations, and provided that Conrail should be sold as an entity if it could operate profitably without subsidy during a specified test period, but should be sold piecemeal if it could not. 45 U.S.C. Secs. 761-765 (1982). One of several provisions in NERSA that were intended to assist Conrail in becoming profitable is section 1159, 45 U.S.C. Sec. 1109 (1982), which specifies that
 
 
 14
 [a]ny cost reductions resulting from the provisions of or the amendments made by [NERSA] shall not be used to limit the maximum level of any rate charged by Conrail for the provision of rail service, to limit the amount of any increase in any such rate (including rates maintained jointly by Conrail and other rail carriers), or to limit a surcharge or cancellation otherwise lawful under chapter 107 of title 49.
 
 
 15
 NERSA also set forth a number of subsidiary "[g]oals and objectives," 45 U.S.C. Sec. 1103 (1982), for Conrail to achieve in order to become profitable. The fourth enumerated goal reads as follows:
 
 
 16
 (A) Conrail should enter into collective bargaining agreements with its employees which would reduce Conrail's costs in an amount equal to $200,000,000 a year, beginning April 1, 1981, adjusted annually to reflect inflation.
 
 
 17
 (B) Agreements under this subparagraph may provide for reductions in wage increases and for changes in fringe benefits common to agreement employees, including vacations and holidays.
 
 
 18
 (C) The cost reductions required under this subparagraph in the first year of the agreement may be deferred, but the aggregate cost reductions should be no less than an average of $200,000,000 per year for each of the first three one-year periods beginning April 1, 1981.
 
 
 19
 (D) The amount of cost reductions provided under this paragraph shall be calculated by subtracting the cost of an agreement entered into under this paragraph from (i) the cost that would otherwise result from the application of the national agreement reached by railroad industry and its employees, or (ii) until such national agreement is reached, the cost which the United States Railway Association estimates would result from the application of such a national agreement.
 
 
 20
 45 U.S.C. Sec. 1103(4). It is undisputed that Conrail has entered into collective bargaining agreements with its employees that set wage levels below the levels prevailing in the industry under the national contract agreement applicable to other railroads, and that the amount of the wage givebacks equals or exceeds the cost reductions mentioned in 45 U.S.C. Sec. 1103(4).
 
 
 21
 There is, however, a dispute over whether Conrail's lower labor costs under its collective bargaining agreements are "cost reductions resulting from the provisions of ... [NERSA]." 45 U.S.C. Sec. 1109 (1982). In the orders at issue in these cases, the Commission determined that the wage givebacks should be deemed to have resulted from NERSA. See Determinations on Notice of Proposed Rulemaking, 49 Fed.Reg. 10,955, 10,957 (1984). Noting that Conrail is entitled to unregulated rate increases under the RCAF, the Commission then reasoned that
 
 
 22
 [i]f Conrail's actual labor costs (reflecting concessions) were figured into the RCAF, the RCAF would be lower than it would be absent the Conrail wage concessions. The result would be that Conrail's increases under the RCAF would be limited by the concessions, and we believe this result violates NERSA's plain terms.
 
 
 23
 Id. at 10,957. Consequently, in the Commission's view it was required to make some adjustment to the RCAF to "harmoniz[e] the statutes." Id.
 
 
 24
 The Commission considered and rejected several alternative methods for revising the RCAF. Some it rejected as inconsistent with the Staggers Act, some as ruled out by NERSA. See id. at 10,957-58. Its reasoning led the Commission to conclude that "the restatement of Conrail labor costs at the national level correctly reflects the intent of Congress in enacting NERSA and the Staggers Act." Id. at 10,957. The Commission therefore amended its methodology for calculating the RCAF "to restate the Conrail portion of the labor component of the index to national agreement levels." Id. Thus, the rate increases available to Conrail and to any other railroad under the RCAF are now determined on the basis of Conrail's hypothetical labor costs under the national agreement rather than on the basis of Conrail's actual labor costs under its collective bargaining agreements.
 
 
 25
 Petitioners raise three principal challenges to the Commission's decision. First, they argue that the wage reductions embodied in Conrail's collective bargaining agreements are not a result of NERSA, and indeed could not be because they were achieved before NERSA was enacted. Therefore, they maintain that NERSA is not intended to shield Conrail from the effects of its labor savings on any of its rates, including rates filed pursuant to the RCAF. See Brief for Petitioners at 26-43. Second, petitioners contend that even assuming that NERSA was intended to insulate Conrail from the effects of wage reduction on the RCAF, "Congress did not intend this to be accomplished through a methodology that requires shippers throughout the nation, and not just shippers over Conrail's lines, to pay artificially inflated rates to all railroads as a result of Conrail's fictitious wage levels." Id. at 25. In petitioners' view, the Commission therefore acted arbitrarily when it rejected alternative proposals for adjusting the RCAF. Indeed, petitioners contend that the Commission could have implemented its understanding of NERSA without adjusting the RCAF in any way, "by providing targeted relief to Conrail though the tariff process." Id.
 
 
 26
 Finally, petitioners contend that the Commission's decision is flawed because, far from harmonizing NERSA and the Staggers Act, the Commission has needlessly created a conflict between the two statutes. According to petitioners, Congress intended the RCAF to track actual inflation in the railroad industry as closely as possible, and consequently "the Commission's decision to substitute national wage level labor costs for Conrail's actual labor costs in the computation of the RCAF is squarely at odds with the language and purpose of [section 203 of the Staggers Act]." Brief for Petitioners at 20.
 
 
 27
 We cannot consider petitioners' challenges, of course, unless we have jurisdiction to review the Commission's decisions. We now address that question.
 
 II.
 
 28
 We ordinarily have jurisdiction to review rules, regulations, and final orders of the Commission. See 28 U.S.C. Secs. 2321, 2342 (1982). That jurisdiction, however, has been limited by section 1152 of NERSA, 45 U.S.C. Sec. 1105(a) (1982), which provides that
 
 
 29
 [n]otwithstanding any other provision of law, the special court shall have original and exclusive jurisdiction over any civil action--
 
 
 30
 (1) for injunctive, declaratory, or other relief relating to the enforcement, operation, execution, or interpretation of any provision of or amendment made by [NERSA], or administrative action taken thereunder to the extent such action is subject to judicial review....
 
 
 31
 The threshold question in these cases is therefore whether they fall within NERSA's grant of exclusive jurisdiction to the Special Court.
 
 
 32
 As we read it, section 1152 confers jurisdiction in the Special Court over two categories of cases: (1) cases relating to the enforcement, operation, execution, or interpretation of NERSA, and (2) cases relating to administrative action taken under NERSA.[3] We need not decide whether the present cases are included in the first category,[4] because we find that petitioners' challenges are directly related to administrative action taken under NERSA, and therefore are included in the second category.
 
 
 33
 We begin our analysis by asking how we are to determine whether a case relates to administrative action taken under NERSA. The statute and the legislative history do not speak directly to this point. Moreover, so far as we are aware, none of the cases that discuss the scope of section 1152's grant of jurisdiction have involved administrative action.[5] Consequently, these are seemingly issues of first impression.
 
 
 34
 Nonetheless, the case law and the legislative history offer some guidance. In Consolidated Rail Corp. v. County of Monroe, 558 F.Supp. 1387, 1390 (Sp.Ct.R.R.R.A.), cert. denied, 462 U.S. 1120, 103 S.Ct. 3089, 77 L.Ed.2d 1350 (1983), the Special Court stated that "implicit in the grant of original and exclusive jurisdiction to the Special Court under NRSA is the intention that it will not consider every issue which might tangentially touch the provisions of NRSA. Our jurisdiction is limited to litigation which has the potential for significantly affecting implementation of the Act" (footnote omitted). Thus, in the Special Court's view, a civil action falls within section 1152's first category only if the issues presented directly relate to NERSA and if resolution of those issues might significantly affect the implementation of NERSA. See also Coleman v. Southeastern Pennsylvania Transportation Authority, 562 F.Supp. 534, 537 (Sp.Ct.R.R.R.A.1983) (Special Court has exclusive jurisdiction over a suit arising from "a controversy comprehensively addressed by Congress [in NERSA]"); Liebitzke v. Consolidated Rail Corp., 532 F.Supp. 831, 832 (N.D.Ohio 1982) (dismissing action for injunctive relief brought under Title VII of NERSA). Though these cases do not involve the "administrative action" head of the Special Court's jurisdiction, the principle they enunciate seems to us equally applicable to both jurisdictional categories. See supra note 4.
 
 
 35
 There is no detailed analysis of section 1152 in NERSA's legislative history, but a similar conclusion emerges from what references there are. The Senate Report on S. 1100, which contained a provision substantially identical to section 1152, stated that "[i]t is intended that all litigation directly relating to the act be concentrated in the Special Court which has developed great expertise in Northeast rail matters." S.Rep. No. 101, 97th Cong., 1st Sess. 44 (1981). See also S.Rep. No. 139, 97th Cong., 1st Sess. 341, reprinted in 1981 U.S. Code Cong. & Ad. News 396, 629 (same). The House Report simply stated that the provision in the House bill which became section 1152(a) "consolidates all civil actions arising out of the provisions of or the amendments made by this Act to the Special Court." H.R.Rep. No. 153, 97th Cong., 1st Sess. 33 (1981). Although these two formulations are somewhat different, they are alike in suggesting that section 1152 applies only to litigation that directly involves NERSA and may affect its implementation.[6]
 
 
 36
 We think that examination of the issues presented and of the effects that a decision on the merits would have on the implementation of NERSA is therefore relevant in deciding whether a case relates to administrative action taken under NERSA. In addition, however, it may be necessary to inquire whether the administrative agency has any statutory authority to take action under NERSA, and, if so, whether the agency relied on that authority when it acted. Otherwise, it would seem that the administrative action being challenged is not action taken under NERSA. We conclude that these consolidated cases are directly related to action the Commission took under authority conferred by NERSA.
 
 
 37
 The House Report on the bill that became NERSA declared--referring to the cost reduction provisions of section 1159--that "[t]he Committee expects the Commission to prescribe a simple formula to allow implementation of this section without undue burden on shippers, Conrail, or other railroads." H.R.Rep. No. 153, supra, at 39-40. That gloss on section 1159 clearly establishes what section 1159's reference to maximum rates already suggests--that the ICC has jurisdiction under NERSA to promulgate a rule implementing section 1159. That would certainly be "administrative action taken [under NERSA]." 45 U.S.C. Sec. 1105(a)(1).
 
 
 38
 To be sure, the Commission's action here involved the modification of a rule originally promulgated under the Staggers Act. See Determinations on Notice of Proposed Rulemaking, 49 Fed.Reg. at 10,955. But the change was made "in order to satisfy certain portions of [NERSA]." Id. Congress intended the ICC to issue a rule implementing section 1159 to secure its benefits to Conrail. Relying on its reading of section 1159, the ICC has issued a rule of general applicability that is intended to secure precisely those benefits to Conrail. At least to the extent that the rule determines Conrail's rights under section 1159 of NERSA, the ICC's action must be deemed to have been taken under NERSA. Indeed, it would seem that if we were to hold for petitioners on the merits, Conrail could sue in the Special Court on the ground that the RCAF rule, as applied to it, violates NERSA. That would create a serious threat of inconsistent decisions by this court and the Special Court, and strongly suggests that these cases belong in the Special Court.[7]
 
 
 39
 Examination of the issues presented by petitioners' challenges, and of the potential effects decision on the merits would have on the implementation of NERSA, confirms this conclusion and establishes that these cases are directly related to the actions the Commission took under section 1159 of NERSA. The threshold issue on which the validity of the Commission's orders turns is whether section 1159's reference to "[a]ny cost reductions resulting from the provisions of or the amendments made by [NERSA]" was intended by Congress to include the reductions in labor costs achieved by Conrail's 1981 agreement with its employees. That issue obviously must be decided by reference to the reasonableness of the Commission's interpretation of the language and legislative history of NERSA, especially the import of 45 U.S.C. Sec. 1103(4), which says Conrail "should" enter into collective bargaining agreements that would reduce its costs by an average of $200,000,000 per year.
 
 
 40
 If petitioners are correct in asserting that the 1981 wage give-backs do not "result[ ]" from NERSA, then the ICC's rulemaking cannot be sustained. If, on the other hand, the ICC is correct, then the issue of the interrelationship of section 1159 of NERSA and the RCAF provisions of the Staggers Act must be reached. That issue, too, necessarily involves the interpretation of section 1159. See Brief for Petitioners at 20-22 (arguing, on the basis of the language of section 1159, that an RCAF that employed Conrail's actual costs would not have the effect section 1159 forbids). In fact, the Commission concluded that it was required by NERSA to allow Conrail to employ a modified RCAF using Conrail's hypothetical labor costs. See Determinations on Notice of Proposed Rulemaking, 49 Fed.Reg. at 10,957. Thus this aspect of the Commission's decision rests in large part on its interpretation of NERSA.
 
 
 41
 Petitioners' first two challenges, then, raise NERSA issues that are potentially dispositive of these cases, rather than tangential to them. These issues, moreover, are far from unimportant for the implementation of NERSA. If petitioners are right on the first issue, Conrail will be forced to pass through to its shippers certain benefits of the 1981 wage hold-down. If petitioners are right on the second, Conrail will have to avail itself of other statutory avenues to secure those benefits for itself, and will lose a portion of the swift rate increases otherwise obtainable under the RCAF. Whichever way these issues are resolved, they have a substantial impact on a central goal of NERSA--"to provide Conrail the opportunity to become profitable." 45 U.S.C. Sec. 1103.
 
 
 42
 If these were the only NERSA issues involved here, we might well conclude that petitioners' remaining challenge does not belong in the Special Court. Cf. Pennsylvania v. ICC, 535 F.2d 91, 93 (D.C.Cir.), cert. denied, 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976) (dismissing petitioners' constitutional challenges to the Regional Rail Reorganization Act because the 1976 amendments gave the Special Court jurisdiction over such claims, but retaining jurisdiction over petitioners' contentions that certain ICC regulations were invalid under the Act). The argument would be that the ICC in effect engaged in two rulemaking proceedings here: first, it promulgated a rule determining the scope of Conrail's special privileges under NERSA and established how those privileges affect Conrail's ability to use the RCAF. That proceeding clearly is appealable to the Special Court. Secondly, it could be argued, the ICC determined that the special protection NERSA affords Conrail justifies altering the RCAF as applied to railroads generally. That determination, which could be seen as resting primarily on Congress' intent in creating the RCAF, would involve NERSA only tangentially, and petitioners' challenge to it could therefore properly be decided by this court.
 
 
 43
 This argument overlooks the fact that the Commission's interpretation of NERSA was largely responsible for its ruling that the burdens of an upward adjustment to the RCAF for the benefit of Conrail should not be shifted to other railroads by adopting a dual-index system. The question, as the Commission framed it, was where the burdens associated with giving Conrail the relief the Commission thought NERSA required should, under NERSA, be made to fall. See Determinations on Notice of Proposed Rulemaking, 49 Fed.Reg. at 10,958. The Commission read NERSA as requiring that "the extent to which these labor cost savings result in lower rates should be left to Conrail and determined by normal market forces rather than regulatory fiat." Id. According to the Commission, the effect of an RCAF that used Conrail's actual labor costs would be to create a secondary benefit to non-Conrail shippers and an equivalent burden on non-Conrail railroads. The Commission saw "no evidence that Congress intended that result when it enacted NERSA." Id.
 
 
 44
 We by no means deny that the Commission's interpretation of the Staggers Act was also central to this portion of its decision. Specifically, the ICC found that "[i]t was clearly the intent of the Staggers Act to enable the railroads to fully recover increased costs." 49 Fed.Reg. at 10,957. That assessment of the purpose of the RCAF undoubtedly played an important role in the Commission's decision to modify the RCAF in a manner which reflected the fact that "[t]he nation's railroads other than Conrail will continue to incur the labor cost increases imposed by the national agreement." Id. at 10,958. It is hardly surprising to find two rationales--one based on the Staggers Act, the other on NERSA--inextricably intertwined in an analysis that is explicitly attempting to harmonize the two statutes. The point remains that the interpretation of NERSA appears to have been a decisive consideration that impelled the Commission to choose one method of modifying the RCAF and reject certain of the alternative proposals.
 
 
 45
 It also follows from this analysis that petitioners' challenge to the modified RCAF as applied to railroads other than Conrail may have a significant effect on the implementation of NERSA. We do not doubt that the primary purpose of section 1159 of NERSA was to benefit Conrail. But the Commission has construed section 1159 as requiring that those benefits be made available to Conrail without imposing what the Commission views as a related burden on other railroads. Especially in light of Congress' intention that the Commission should "implement[ ] ... section [1159] without undue burden on shippers, Conrail or other railroads," H.R.Rep. No. 153, supra, at 39-40, we cannot say that this aspect of the Commission's modification of the RCAF does not have a significant effect on the implementation of section 1159 of NERSA. Cf. Norfolk & Western Ry. v. Public Utilities Commission, 582 F.Supp. 1552, 1556 (Sp.Ct.R.R.R.A.1984), cert. denied, --- U.S. ----, 104 S.Ct. 2400, 81 L.Ed.2d 356 (1984) ("[t]he legislative goal [of the Regional Rail Reorganization Act and NERSA] was to give Conrail the opportunity to become profitable, but not necessarily to disadvantage all other railroads at the same time"). Of course, to some extent the question whether this aspect of the rulemaking affects the implementation of NERSA overlaps with the question, on the merits, of the reasonableness of the Commission's interpretation of section 1159. We express no view as to the merits, but we think that the Commission's interpretation is not self-evidently incorrect and accordingly we decline to ignore it for purposes of our jurisdictional analysis.
 
 
 46
 Under these circumstances, we must conclude that each of petitioners' challenges in these consolidated cases is directly related to administrative action taken under NERSA. That being so, it seems clear that petitioners' challenges fall within the exclusive jurisdiction NERSA confers on the Special Court.
 
 A.
 
 47
 At oral argument, both counsel for petitioners and counsel for the Commission suggested that the Special Court's decision in Consolidated Rail Corp. v. Delaware & Hudson Ry., 543 F.Supp. 1079 (Sp.Ct.R.R.R.A.1982), indicates that this court, rather than the Special Court, has jurisdiction over the present case. We disagree. In Delaware & Hudson Ry., the Special Court's jurisdiction was invoked under section 209(e)(2) of the Regional Rail Reorganization Act of 1973 ("3 R Act"), as amended by the Railroad Revitalization and Regulatory Reform Act of 1976, 90 Stat. 31, 86, codified at 45 U.S.C. Sec. 719(e)(2) (1982), which, as relevant here, gives that court original and exclusive jurisdiction over "any action ... to interpret, alter, amend, modify or implement any of the orders entered by [the Special Court] ... in order to effect the purposes of the [3 R] Act or the goals of the Final System Plan." After this jurisdiction was conferred, Congress in the Staggers Act specifically provided that the ICC "may require rail carriers to enter into reciprocal switching agreements, where it finds such agreements to be practicable and in the public interest, or where such agreements are necessary to provide competitive rail service." 49 U.S.C. Sec. 11103(c)(1) (1982).
 
 
 48
 In Delaware & Hudson Ry., Conrail sought a stay from the Special Court enjoining proceedings before the ICC initiated by Delaware & Hudson to secure an ICC order compelling Conrail to accord reciprocal switching rights. 543 F.Supp. at 1081. Such an order would in effect have modified a prior conveyance of trackage rights issued under the Final System Plan referred to in section 209(e)(2) of the amended 3 R Act. Id. The Special Court therefore held that it had jurisdiction to decide whether a stay should be granted.
 
 
 49
 However, because the authority conferred on the ICC by the subsequent enactment of the Staggers Act "is nationwide ... [and] there is nothing to indicate that Conrail or other railroads in the northeast that had acquired property pursuant to the [Final System Plan] were to be outside its ambit," the court held that Conrail's complaint against the ICC failed to state a claim for which relief could be granted. 543 F.Supp. at 1082. The Special Court expressly distinguished an earlier case in which it had stated that it possessed the power to stay the ICC from issuing an order declaring the meaning of the Final System Plan, on the grounds that "[e]nactment of the Staggers Act differentiates this case." Id. (discussing Consolidated Rail Corp. v. Pittsburgh & Lake Erie R.R., 459 F.Supp. 1013 (Sp.Ct.R.R.R.A.1978)). The impact of the order sought by Delaware & Hudson on Conrail's rights under the Final System Plan, it suggested, should be considered by the ICC in determining whether to issue the proposed order, and judicial review should lie in the Court of Appeals pursuant to 28 U.S.C. Sec. 2321.
 
 
 50
 Petitioners' argument, we take it, is that Delaware & Hudson Ry. indicates, by analogy, that the Special Court would dismiss petitioners' challenges for failure to state a claim on which it could grant relief, and that notwithstanding that the Commission here considered the impact of various versions of the RCAF on Conrail, appeal properly lies in this court. We think there are crucial differences between the jurisdictional grants in the 3 R Act and NERSA that destroy the attempted analogy.
 
 
 51
 The 3 R Act did not give the Special Court jurisdiction over challenges to agency action on the merits. Under these circumstances, in the Special Court's view, the 3 R Act's grant of original and exclusive jurisdiction necessarily implied that an agency would lack jurisdiction over matters falling within the Special Court's jurisdiction. See Pittsburgh & Lake Erie R.R., 459 F.Supp. at 1018. Consequently, the Special Court could stay agency proceedings in order to protect its exclusive jurisdiction. Id. However, by later expressly giving the ICC jurisdiction to conduct certain proceedings under the Staggers Act, Congress removed the basis on which the Special Court might otherwise have stayed the ICC proceedings at issue in Delaware & Hudson Ry. See 543 F.Supp. at 1082.
 
 
 52
 The present case presents a very different situation. As we have seen, NERSA's grant of original and exclusive jurisdiction to the Special Court specifically provides for jurisdiction over any civil action directly relating to "administrative action taken [under NERSA] to the extent such action is subject to judicial review." 45 U.S.C. Sec. 1105. Hence, appeals from agency action taken under NERSA must lie in the Special Court rather than in the Court of Appeals. We have established that petitioners' challenges are directly related to action taken by the Commission under section 1159 of NERSA. Furthermore, in light of the clear congressional expectation that the Commission would implement section 1159, it cannot be maintained that the Commission lacks jurisdiction to conduct proceedings under that provision. Cf. United Transportation Union v. Consolidated Rail Corp., 593 F.Supp. 1346, 1348-50 (Sp.Ct.R.R.R.A.1984) (notwithstanding section 1152's grant of original and exclusive jurisdiction to the Special Court, the amendments made by NERSA to section 714 of the 3 R Act reveal that Congress intended that arbitrators in section 714 proceedings would decide the statutory rights of parties under Title VII of NERSA). It follows that appeal properly lies in the Special Court.
 
 B.
 
 53
 The Commission's decision that the RCAF must be modified, and the Commission's choice as to the form that modification should take, turn in large part on the interpretation of NERSA and are plainly intended to implement section 1159 of that Act. We therefore hold that petitioners' challenges to the Commission's actions are within the exclusive jurisdiction of the Special Court. We emphasize, however, that our holding is a narrow one. For example, although Congress plainly intended the Special Court to adjudicate controversies arising under NERSA, Congress gave no indication that it intended to make the Special Court the overseer of every ICC rulemaking and rate proceeding that has an effect, however remote, on the rights, privileges, and obligations created by NERSA. Some line must therefore be drawn, and while we think that is a task best left to case by case elaboration, we reiterate that the mere presence of an issue related to NERSA is not to be taken as a sufficient condition for exclusive Special Court jurisdiction over appeals from administrative proceedings. See supra note 4.
 
 
 54
 These consolidated cases are transferred, for want of jurisdiction, to the Special Court pursuant to 28 U.S.C. Sec. 1631 (1982).
 
 
 
 [1]
 Edison Electric Institute petitions for review in No. 84-1044 and No. 84-1122. The Association of American Railroads intervenes in support of the Commission in these two cases. Alabama Power Co., et al., petitions for review in No. 84-1123; Western Coal Traffic League petitions for review in No. 84-1151; and Eastern Coal Transportation Conference petitions for review in No. 84-1152. Numerous intervenors are also before the court in support of petitioners
 
 
 [2]
 The orders under review are (1) Notice, 48 Fed.Reg. 56,659 (1983); (2) Notice of Approval of Rail Cost Adjustment Factor, 48 Fed.Reg. 57,633 (1983); (3) Notice of Approval of Rail Cost Adjustment Factor, 49 Fed.Reg. 11,022 (1984); and (4) Determinations on Notice of Proposed Rulemaking, 49 Fed.Reg. 10,955 (1984)
 
 
 [3]
 We note that there is some difficulty in parsing the last clause of Sec. 1105(a)(1). The phrase "or administrative action taken thereunder to the extent such action is subject to judicial review" is incomplete--there should be a prepositional phrase following "or" and preceding "administrative action." To construe the statute, one is therefore forced to borrow one of the prepositional phrases used earlier in Sec. 1105(a)(1) and insert it into the last clause. Three of the prepositional phrases previously used could plausibly be carried over in this manner: (1) "[over ] administrative action taken [under NERSA];" (2) "[relating to ] administrative action taken [under NERSA];" and (3) "[of ] administrative action taken [under NERSA]." Under any of these readings, this case falls within the Special Court's jurisdiction. We therefore need not explore the slightly different meanings each of these readings gives to the clause, or choose between those readings
 
 
 [4]
 We choose to proceed under Sec. 1152's second category because application of the first may in some classes of cases present difficulties we do not wish to address even inadvertently. It appears that not every challenge to agency action that involves the enforcement, operation, execution, or interpretation of NERSA, but that is not taken under NERSA, is within the first category of cases covered by Sec. 1152. For example, in Lamoille Valley R.R. v. ICC, 711 F.2d 295 (D.C.Cir.1983), we reviewed the Commission's approval of a railroad merger under the Interstate Commerce Act. One of the many issues presented in that complex case was whether the Commission's decision to expedite certain aspects of the merger proceedings was an abuse of its discretion. See id. at 326. The Commission expressly based its decision on Sec. 1164(a) of NERSA, 45 U.S.C. Sec. 1112(a), which requires the Commission to issue a final decision on any merger application involving a bankrupt Northeast railroad within 180 days. See 711 F.2d at 327. We construed Sec. 1164(a) and concluded that given the time constraint NERSA placed on the Commission its "explanation for its action is reasonable and consistent with Congressional intent." Id. We have no doubt this course was proper, and that we were not required by Sec. 1152 to sever this challenge to the merger proceedings for adjudication in the Special Court. Section 1164(a) requires Commission action "in any proceeding before the Commission under section 11344 or 11345 of [title 49]," not Commission action in proceedings the Commission is required to commence by virtue of NERSA itself. Therefore we very much doubt that the ICC's decision to expedite the proceedings, albeit based on the interpretation of NERSA, was "taken thereunder," as those words are used in Sec. 1152. Beyond that, this procedural provision, although it had some effect on the substantive rights of the railroads involved in the merger proceedings, see id. at 328, was far from central to NERSA in the way that Sec. 1159 is. Finally, the challenge to the reasonableness of the Commission's expidited procedural schedule rested in large part on the contention that the Commission had not complied with the requirements of the Administrative Procedure Act, rather than on a real disagreement with the Commission's interpretation of NERSA. See id. at 327-28
 
 
 [5]
 The only case we have found in which the Special Court has entertained a challenge to administrative action taken under NERSA is New England Southern Ry. v. U.S. Dep't of Transp., 544 F.Supp. 917 (Sp.Ct.R.R.R.A.1982). In that case two unsuccessful applicants challenged a decision by the Federal Railroad Administrator to transfer two railroad lines formerly owned by Conrail. Id. at 918. The decision was taken pursuant to a delegation by the Secretary of Transportation of his authority under Sec. 1155 of NERSA. Id. at 919. The Special Court did not discuss its jurisdiction
 
 
 [6]
 The only reference we have found to the second category of Sec. 1152 cases is an isolated statement in the Senate Report that "[a]dministration [sic] action taken under the legislation would be subject to review to determine if the Secretary had a reasonable basis for the contested determination, with the exception that ... no review is provided for the Secretary's approval of a transfer agreement or the implementation of that agreement." S.Rep. No. 101, supra, at 44. See also S.Rep. No. 139, supra, at 341, reprinted in 1981 U.S.Code Cong. & Ad.News at 629 (same). The reference is to the Secretary of Transportation, who is authorized to make various determinations under NERSA. See, e.g., 45 U.S.C. Sec. 745(g) (1982). There is no basis for inferring from this statement that only administrative action taken by the Secretary under NERSA is subject to review in the Special Court. The language of Sec. 1152 contains no such limitation. Beyond that, Congress expressly provided that various actions under NERSA should be taken by the ICC, see, e.g., 45 U.S.C. Sec. 1114 (1982), and in one instance expressly made action taken by the Commission unreviewable in any court. 45 U.S.C. Sec. 1111(d) (1982). Clearly, then, Congress must have understood that some actions taken by the Commission under NERSA would be reviewable in the Special Court
 
 
 [7]
 Conrail is not an independent party to these petitions, but Conrail is a member of intervenor Association of American Railroads. For that reason Conrail might be collaterally estopped from litigating in the Special Court issues that this court would decide were we to reach the merits of petitioners' challenges. See generally Western Coal Traffic League v. ICC, 735 F.2d 1408, 1411 (D.C.Cir.1984) (trade association member precluded from litigating claim previously decided against trade association where member pointed to no inadequacy of trade association's presentation of issues). While collateral estoppel might remove the threat of inconsistent adjudications of the issues presented in this case, it would also mean that Conrail would never have its day in the court Congress unquestionably intended to adjudicate Conrail's rights and privileges under NERSA